UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 Cr. 36 (CM)

———————————————————

UNITED STATES OF AMERICA

-against-

MENACHEM YOULUS,

Defendant.

———————————————————

SENTENCING MEMORANDUM ON
BEHALF OF MENACHEM YOULUS

BRAFMAN & ASSOCIATES, P.C.
*Attorneys for Defendant*
*Menachem Youlus*
767 Third Avenue, 26th Floor
New York, New York 10017

BENJAMIN BRAFMAN
MARK M. BAKER
JACOB KAPLAN
          Of Counsel

Jennifer Li
      Legal Assistant
      Assisting on the Memorandum

**Table of Contents**

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II..    Menachem Youlus' Statement to the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    The Subject Torah Scrolls Were All of
        Unassailable and Unquestionable Provenance . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     Even Some Who are Categorized By the Government as "Victims"
        Continue to Support Rabbi Youlus and Plead for Leniency . . . . . . . . . . . . . . . . . 8

V.      Menachem Youlus' Sterling Background and Educational Pursuits . . . . . . . . . . . . . 15

        A.      Rabbi Youlus' Early Years, Education, and Marriage . . . . . . . . . . . . . . . . . . 15

        B.      Throughout His Life, Menachem Youlus Has Been a Giving,
                Generous and Kind-Hearted Person, Who Has Impacted Upon
                Others in the Most Positive Ways . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.      Menachem Youlus Has Devoted Endless Attention to
                Children With Special Needs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        D.      Manager of the Bookstore and a Member of the Community --
                The Bookstore Becomes a Center of Community Charity . . . . . . . . . . . . . . . 26

        E.      Menachem Youlus' Conduct in this Case Represents a
                Stunning  Departure From an Otherwise Unblemished Life  . . . . . . . . . . . . . 30

        F.      As Even His Community, Which Continues to Support Him, Fully
                Recognizes, Rabbi Youlus Has Demonstrated Extraordinary and
                Unceasing Remorse For His Criminal Acts . . . . . . . . . . . . . . . . . . . . . . . . . 35

        G.      Counsel Now Holds the sum of $862,044.33 in Escrow, in
                Full Compliance With Defendant's Financial Obligation Under
                the Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        H.      The Youlus Family Will Suffer Greatly in Rabbi Youlus' Absence . . . . . . . . . 39

VI.     Guidelines Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        A.      Adjusted Offense Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B.    Because Menachem Youlus is Extremely Frail and Suffers
       From a History of Coronary Artery Disease, Any Incarceration
       Could Have a Most Serious Adverse Impact Upon His Health . . . . . . . . . . . . . 45

C.    Menachem Youlus' Continual Good Works and Consistent
       Acts of Communal Dedication Compel a Downward Departure  . . . . . . . . . . 47

D.    Menachem Youlus' Extraordinary Family Circumstances
       Requires a Downward Departure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

E.    The Extraordinary Restitution in This Case Further
       Warrants a Downward Departure  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VII.   After Considering the Guidelines, The Court Should
       Impose a Lesser, Non-Guidelines Sentence Based on
       the Criteria Delineated in 18 U.S.C. §§ 3553(a) and 3661 . . . . . . . . . . . . . . . . . . . . 55

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

## Table of Authorities

**Cases**

Gall v. United States,  552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57 59

Griffin v. Wisconsin, 483 U.S. 868 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Kimbrough v. United States, 552 U.S. 85 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Koon v. United States, 518 U.S. 81 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Pepper v. United States, 131 S.Ct. 1229 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

Simon v. United States, 361 F.Supp.2d 35 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . 58, 59

Shattuck v. Hoegl, 523 F.2d 509, 514 n. 8 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . 55

Williams v. New York, 337 U.S. 241 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Adelson, 441 F.Supp.2d 506 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . .  49, 51

United States v. Alba, 933 F.2d 1117 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Akin, 62 F.3d 700, 702 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . .56

United States v. Arjoon, 964 F.2d 167, 171 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . 54

United States v. Booker, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Broderson, 67 F.3d 452 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . .53, 54, 55

United States v. Canova, 412 F.3d 331 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

United States v. Carmona-Rodriguez, 04 CR 667, 2005 WL 840464
    (S.D.N.Y. Apr. 11, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58- 59

United States v. Carpenter, 320 F.3d 334, 343 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . .55

United States v. Castellanos, 355 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Cavera, 505 F.3d 216 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Coleman, 370 F.Supp.2d 661 (S.D. Ohio 2005) . . . . . . . . . . . . . . . . . . 58

United States v. Condelee, 961 F.2d 1351, 1353 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . 54

United States v. Cooper, 394 F.3d 172 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-48

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Crook, 9 F.3d 1422, 1426 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . .54

United States v. DeMonte, 25 F.3d 343, 346 (6th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 55

United States v. Eberhard, 03 CR. 562, 2005 WL 1384038
        (S.D.N.Y. June 9, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Faria, 161 F.3d 761 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

United States v. Flowers, 55 F.3d 218, 222 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 55

United States v. Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . 60

United States v. Gaines, 295 F.3d 293 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Galante, 111 F.3d 1029 (2d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Gee, 226 F.3d 885, 902 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

United States v. Hairston, 96 F.3d 102, 108 (4th cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 54

United States v. Havey, 227 Fed. Appx. 150,
        2007 WL 1092914 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

United States v. Hernandez, 03 CR. 1257, 2005 WL 1242344
        (S.D.N.Y. May 24, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Huerta, 371 F.3d 88 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

United States v. Jimenez, 212 F. Supp.2d 214, 216 (S.D.N.Y.2002). . . . . . . . . . . . . . . . . . 45,46

United States v. Johnson, 964 F.2d 124 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Jones, 158 F.3d 492 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States v. Kim, 364 F.3d 1235,1240 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . 54-55

United States v. Knights, 534 U.S. 112 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Kon, No. 04 CR, 271-03,
        2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Lucania, 379 F. Supp.2d 288 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . 58

United States v. McFarlin, 535 F. 3d. 8080, 811 (8th cir. 2008). . . . . . . . . . . . . . . . . . . . . . 46

United States v. Madrigal, 331 F.3d 258 (2d Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

United States v. Miller, 991 F.2d 552 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

United States v. Nellum, 2:04-CR-30, 2005 WL 300073
      (N.D. Ind. Feb.3, 200) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58,59

United States v. Rivera, 994 F.2d 842, 951 (1st Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 54

United states v. Seacott, 15 F.3d 1380, 187 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 54

United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

United States v. Smith, 331 F.3d 292 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

United States v. Speed Joyeros, S.A., 204 F.Supp.2d 412
      (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

United States v. Sprei, 145 F.3d 528 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Thurston, 544 F.3d 22 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

United States v. Tomko, 562 F.3d 558 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

United States v. Ward, 814 F. Supp 23 (E.D.Va. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

United States v. Woods, 159 F.3d 1132 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**Statutes**

18 U.S.C. § 981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

18 U.S.C. § 3771 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

28 U.S.C. § 2461 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Sentencing Guidelines**

U.S.S.G. § 5B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

U.S.S.G. § 5H1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

U.S.S.G. § 5H1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,45,46

U.S.S.G. § 5H1.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 52

U.S.S.G. § 5H1.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 47

U.S.S.G. § 5K2.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 Cr. 36 (CM)**

---

UNITED STATES OF AMERICA

-against-

MENACHEM YOULUS,

Defendant.

---

### SENTENCING MEMORANDUM ON
### BEHALF OF MENACHEM YOULUS

### Preliminary Statement

This Sentencing Memorandum is respectfully submitted to aid this distinguished Court in determining the appropriate sentence to impose in this very difficult case. A fair reading undoubtedly reflects that Defendant, Rabbi **MENACHEM YOULUS,** is a fundamentally decent, honorable and beloved man who has, inexplicably, committed a serious crime for which he has accepted full responsibility.

On February 2, 2012, Defendant was convicted in this Court, upon his plea of guilty, pursuant to a plea agreement with the Government, of one count each of Mail Fraud, in violation of 18 U.S.C. § 1341, and Wire Fraud, in violation of 18 U.S.C. § 1343. Such agreement further requires Defendant to remit to the United States, pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461, a sum of money equal to $862,044.33 in United States currency.

At the time of the plea, the Court indicated its desire that any such recovered funds be allocated toward the victims of the subject fraud. At present, in furtherance of that effort, counsel

are pleased to report that they now retain in escrow the full amount owed. We await further direction from the Court as to how those funds are to be distributed.

## I.   **Introduction**

Menachem Youlus, age 51, is the father of nine children, six of whom are under the age of 18 and eight of whom still reside with him and his wife, Rifka. He is also the husband of a severely depressed and entirely dependant wife and the son of two elderly and infirm parents, whose business and the sole source of the entire family's livelihood he alone manages. By most, if not all, accounts, Defendant is an uncommonly decent, beneficent  and highly regarded member of his community.

Nonetheless, he stands convicted, by his plea of guilty, of a serious crime. Thus, in stark contrast to all the magnificent deeds and the sterling reputation that have been the hallmarks of his existence, Defendant will soon present himself for sentencing as a disgraced, humiliated man who could never have envisioned himself in such a situation.

As will be demonstrated, what has always been understood by those who know Defendant well as his life-long penchant for seemingly innocuous hyperbolic embellishment (resulting from what has since been diagnosed as a deep-seated psychological effort to compensate for certain inherent insecurities, *see* Exhibit 1), has been  catapulted by this case into a serious matter of fraud. So understood, what might, in the past, have amounted to wholly innocent conduct on Defendant's part has, under these facts, spun completely out of control.

Nonetheless, the fact is that, given the inevitable pain that has been inflicted upon those who have suffered so dearly and who were regrettably projected anew into the role of victim, Rabbi Youlus' involvement in the charged acts remains diametrically inconsistent with the man he has always prided himself to be. For the charged conduct is wholly uncharacteristic of the communal

figure who, despite his crimes, remains in high regard by those who have either reaped the dividends of his selfless beneficence or are simply aware of his widespread reputation for unceasing acts of kindness.

The unalterable fact remains that, aside from the aberrant and unquestionably criminal conduct manifested by his conviction, an extraordinarily contrite Menachem Youlus -- not because he was caught, but solely because he has been chastened by the heavy weight of his overbearing iniquities -- remains revered. Indeed, as will be shown, and perhaps most strikingly, even many of the referenced victims in this case still believe him to be a person of towering integrity, profound righteousness and unceasing charitableness, who should not be incarcerated.

The reality is that, throughout his life, and notwithstanding his inexplicable criminal conduct in this case, Rabbi Youlus has epitomized all that a productive member of any particular community should be. For decades, striving to improve the lives and lots of his neighbors, he has always been available to assist anyone who could benefit from his compassion, his empathy and his time.

In this pre-sentence memorandum, amidst discussing Defendant's background, his heartfelt statement to the Court, his physical condition and the overwhelming circumstances attending his multi-faceted familial responsibilities, we will recall many of the testimonials from myriad correspondents whose words breathe life into these noted qualities.[1] We will then urge that the total offense level be lessened based on requested departures on the grounds of Defendant's extraordinary family circumstances (U.S.S.G. § 5H1.6), his rather precarious physical state (U.S.S.G.

---

[1] All the letters addressed to the Court and received by counsel are included in the two appendices accompanying this memorandum. We have determined, however, not to quote many of the almost 200 letters we have received that simply refer to Defendant as a wonderful person, absent anecdotal support. Accordingly, those referenced herein are included in Appendix A and the remaining letters are included in Appendix B.

§ 5H1.4) and life-long good works (U.S.S.G. § 5H1.11).

Should the Court determine, however, that the total offense level will remain as recommended by the PSR, we beseech your Honor to consider Menachem Youlus' personal responsibilities and his lifetime of otherwise exemplary rectitude. Make no mistake: *Defendant does not seek forgiveness from the Court.* Rather, he well understands that any available absolution is strictly a matter between him and his victims -- and, ultimately, with his Creator. In the final analysis, therefore, given the otherwise exemplary life which Defendant has led, we do ask that a non-guidelines sentence be imposed pursuant to 18 U.S.C. §§ 3553(a) and 3661, as recently reinvigorated by the Supreme Court in <u>Pepper v. United States</u>, 131 S.Ct. 1229 (2011), which is "sufficient, but *not* greater than necessary."

In the final analysis, we ask the Court to consider Rabbi Youlus' impeccable background as a friend, colleague, mentor, parent, community member and son; to acknowledge his commitment, over five decades, to myriad acts of kindness and charity; to consider Defendant's precarious physical health; to understand the needs of his wholly dependant family; and to factor the overbearing humiliation resulting from his conviction. On these premises, it is our hope that the Court will be persuaded that there is merited a lesser, non-Guidelines sentence of probation in conjunction with community service or home confinement.

On the other hand, if the Court determines that incarceration is required, we ask that your Honor consider a term measured in months rather than years. Should any such minimal sentence be imposed, it would hopefully enable Menachem Youlus to safeguard his life and his family's well-being, while affording him the ability to continue devoting a considerable amount of time on behalf of those communal members who would undoubtedly benefit from his consummate humanity.

II.     **Menachem Youlus' Statement to the Court**

Rabbi Youlus has prepared the following statement to the Court:

Dear Judge McMahon:

I stand before you today as a humbled and beaten man. I have shamed myself, I have shamed my family, and I have shamed my community. I have caused much pain and suffering to many people. I am very, deeply sorry for all my actions and take full responsibility for all my misdeeds. So I beg all those whom I have hurt to find a place in their hearts to forgive me.

Your Honor, I come from a very close family, as does my wife. My grandmother, Sarah Landesman, would always tell anyone willing to listen that "I raise only Indian Chiefs, no Indians." There was an unspoken rule that each of us children, grandchildren and great-grandchildren were to be community leaders. Today, it is painful for me to know that I have disappointed her. I have let down all those near me. Although I do not deserve it, they have stood by me, out of the goodness of their hearts. I hope I will succeed in instilling good values in my children, and that they will learn from my mistakes.

In furtherance of my actual efforts to rescue and rehabilitate many Torahs from different stages of disrepair, making them kosher when it was called for, and selling these Torahs for a low cost to communities that needed them but could not always afford them, I found myself making up stories about the origins of many scrolls. As I reflect upon such egregious actions on my part, it is now clear to me that I had some inexplicable need to make the seekers happy and I actually thought I would be doing so by giving them a story. I obviously failed to consider either the manifest harm I was causing by making up these stories or the ramifications of my lies.

In the end, I made all the mistakes, and I must bear full responsibility for my actions. Had I realized the pain and suffering that I caused others as a result of my actions – including my wife, my children, my parents, and my community – I could never have exaggerated or lied. If only I had realized what I was doing to myself, none of this would have happened. I would have simply continued my efforts as a scribe doing God's work -- precisely the way it was meant to be.

In hindsight, I now see that people would have been OK with that, with my just doing the work I had always set out to do as a scribe. At the time, however, I could only see the people who I had a need to make happy. As the professionals have pointed out to me, my need and desire for them to feel good, and also for their approval, blinded me. I never even considered the obviously inevitable consequences of my actions.

How I wish I could have all those years back. How I wish that I had

all those opportunities back to set the record straight for them.  It is true that I was very careful to insure that each Torah was kosher: I did not rely solely on my own skills and knowledge, and I always got a second and third opinion, even when this added much to my cost and expense.  But it is the human expense that I was too blind to factor in. It never occurred to me that I was hurting anyone.  I have learned that it is very hard to understand the depths of the level of hurt that I have brought onto others.  I have been taught that the only way to really feel someone's hurt is to put yourself in their place. In that way, you too hurt.  You, too, feel their pain. So I have worked hard during the last several months with many professionals, physical, medical and psychological, to make me understand this pain that I caused.  The burden of guilt that has necessarily resulted has been unbearable.

After many months of hard work, and even beyond what I appreciated at the time of my plea, I have come to fully appreciate the true depth of my sins.  It is a burden that I must carry for the rest of my life.  I have many to ask forgiveness from and it may be too much to ask.  I will keep on trying and hope that many, if not all, will one day find some ability to forgive me.  For all my remaining days on this earth this must be my mission.

Your Honor, I ask forgiveness, not from this Honorable Court, but from God. I take full responsibility for all my horrible actions, and, if it takes me to my last breath, I intend to fully pay restitution to any and all victims. I have hurt my family so that they are suffering immeasurably. I have hurt my livelihood.  I have hurt my health, both physically and mentally.  I continue to work hard with my spiritual advisors, including Rabbis Yaakov Hopfer and Chaim Schwartz, as well as my doctors, Drs. Lehman, Nothmann, Insel and Jakobovitz.  They push me hard. But my will to change my ways and heal the wounds that I have caused is great.

The will to make myself into a better person and learn from my mistakes and misdeeds is very strong. My road is still long and hard but it is God's test and I will continue to work hard at reaching all my goals.  I give myself to the mercy of Your Honor and to the mercy of the court.

Sincerely,

Menachem Youlus

Exhibit 2.

**III.     The Subject Torah Scrolls Were All of
          Unassailable and Unquestionable Provenance**

Before we ask your Honor to review the myriad letters written on Defendant's behalf, one point must be fully appreciated: Despite Defendant's having intentionally lied to various people about his own personal exploits in procuring several of the Torahs he sold, and the fact that some purchasers were certainly influenced in procuring scrolls owing to such false representations, *the Torahs sold by Defendant to the Save a Torah Foundation have since been characterized as "kosher." Moreover, they all possess the precise provenance that he had described.*

This statement has been substantiated by internationally recognized experts, known as "soferim" (plural of "sofer" or scribe). Thus, as demonstrated in Exhibit 3, Rabbi Yitzchok Reisman and Rabbi Itzhak Winer summarize their findings as follows:

> The undersigned Soferim were commissioned by Save A Torah, Inc., to examine 11 Torahs provided to different organizations/purchasers by Rabbi Menachem Youlus of Baltimore, Maryland. We examined the Torahs at different locations in the Washington, D.C., area on February 17, 2010. The following is a summary of our conclusions:
>
> 1.     All the Torahs we examined were written more than 70 years ago, and one is approximately 250 years old.
>
> 2.     All the Torahs we examined were written in Poland or other parts of Eastern Europe.
>
> 3.     Eight of the Torahs we examined are ritually acceptable for use in a synagogue service ("kosher").
>
> 4.     Two Torahs we examined were not currently acceptable for use in a synagogue service ("kosher"), and we were told, after our examination, that they were sold as "not kosher."
>
> 5.     One Torah we examined is not currently acceptable for use in a synagogue service, but we concluded from our examination that it was probably "kosher" when initially repaired and appears to have been inadequately maintained after that repair.
>
> 6.     The quality of the repairs of the Torahs we examined were very good to excellent.

7.    The Torahs we examined will last and should be ritually acceptable ("kosher") for many years if cared for and stored with proper temperature, humidity; and proper rolling.

Bottom line: Because Defendant never delivered any scroll that was either falsely described as kosher, unfit for ritual use or lacking the provenance which he had claimed, the purchasers at least received Torah scrolls that were certainly worth the price they had paid. To be sure, the fact that some purchasers were defrauded, since they would not have otherwise engaged in any such transactions in the first instance had they been aware of Defendant's falsehoods, is what certainly elevates Defendant's hyperbole in this case into an actionable criminal fraud. We are only left, therefore, with the ability to emphasize that, as stated at the time of his plea and as demonstrated in his statement below,  Rabbi Youlus quickly accepted full responsibility for whatever harm his actions had consequently caused.

## IV.    Even Some Who are Categorized By the Government as "Victims" Continue to Support Rabbi Youlus and Plead for Leniency

In any criminal prosecution, the Court unquestionably has the obligation to consider the position of those who, according to the Government, were the direct victims of the defendant's criminal conduct. Indeed, so important a factor is the position of the victims in the sentencing process that the right of victims to be heard has been formalized by statute. *See* 18 U.S.C. § 3771.

Here, there are certainly those who are unforgiving of Menachem Youlus. *Their pain is indescribable; it is real; it is overbearing; it is searing; and it is entirely understandable*. We cannot take issue with a single request for retribution that has been submitted to this Court. Except in the warped minds of the most intractable revisionists, the extraordinary horror of the Holocaust and the unbearable psychic pain that will forever haunt its survivors can neither be minimized nor become the subject of any level of dispute.

On the other hand, it is certainly meaningful that a number of individuals who have been identified by the Government as victims of Defendant's underlying criminal conduct -- which, according to the Government's theory, includes every donor to the Save a Torah Foundation (SATI) -- nevertheless plead for leniency on his behalf from the Court. Given our expectation that the Government will seek to portray Rabbi Youlus, and his offenses, in a most negative light, some of these heartfelt letters impel their being quoted in full.

Raffie and Sarah Freiden write:

> [A]s "victims" . . . we would not like to see Mr. Youlous punished any more than he already has been for what he did. As I am sure that just as we did, everyone else who donated to his cause or made Torah scroll purchases, that the story of how they were acquired or where they came from, were not what was important.  More important, we do not feel we were victimized nor do we regret in any way, making the purchase/donations we did to such a cause.

Exhibit 4 at 1.

Allan Gibber, President of the Gutman Family Foundation, and also identified as a victim, writes:

> As a practicing attorney and as a Rabbi I am deeply distressed by the apparent failings of my good friend[.] I neither justify nor excuse what has occurred. I would, however, respectfully request that Your Honor consider Rabbi Youlus in light of his many decades of loyal service, kindness and efforts on behalf of the community. I see firsthand how the public discussion of his failings has impacted upon him and his family. It is more than just the shame of what he did, but clearly he is also feeling the hurt and pain that he has brought upon those with whom he dealt and upon his family and community.

Exhibit 5 at 1-2.

Rabbi Ethan Seidel, spiritual leader of Congregation Tifereth Israel in Washington, D.C., states:

> I am writing this as a "victim impact statement" in support of Rabbi Youlus. Frankly, I'm not sure why my community, Tifereth Israel Congregation, was listed as a victim at all. We frequently bought books from Menachem, and he often repaired our

Torahs, but we never bought a Torah from him. We have never had any serious complaints about the services he rendered for us.

Though I do not in any way want to minimize the crime to which he has himself confessed, I have always found him a helpful resource in the larger Washington Jewish Community. In fact, his Jewish Book Store was of a much higher quality than would normally be found in a Jewish community of our size. I felt our community was lucky to have someone so dedicated to this store.

Exhibit 6 at 1.

Dr. Ian E. Shuman, another contributor to SATI, writes as follows:

My name is Dr. Ian Shuman, and I have known Menachem Youlus for 23 years. I first met Rabbi Youlus during a meeting with my grandmother and great aunt. After visiting their hometown in Dombrova, Poland, they had discovered that the Nazis had destroyed the cemetery where their ancestors were buried. Headstones where overturned and the graveyard turned into cow pasture. Rabbi Youlus was instrumental in helping them restore the cemetery, transforming it into the proper, respectful resting place it deserved.

Many years later I became a donor to the Save-A-Torah Foundation and had purchased a Torah Scroll from the Foundation. This sacred artifact was dedicated to my grandparents who lost their entire families in the holocaust. Rabbi Youlus helped organize the dedication and my family gathered from around the U.S. to attend this holy ceremony. I will forever be indebted to Rabbi Youlus for helping preserve the memory and honor of my family, both living and deceased. Thus, it was with a heavy heart when I learned of Rabbi Youlus's conviction.

Being a very special person, I have known Menachem Youlus to be a caring, gentle soul. He is a soft-spoken man, a tireless father of nine children, an excellent husband to his wife Rivka, and to me, a shining example of what a man of faith should be. By pleading guilty, Rabbi Youlus has demonstrated acknowledgement of his wrongs and regret for his actions. Therefore, I implore and beg Your Honor and the court to show Menachem Youlus extreme leniency in this case and impose the lowest sentence permitted under the law.

Exhibit 7 at 1.

Rabbi Robert L. Tobin, another person designated as a victim, also has a great deal

to say in furtherance of leniency for Rabbi Youlus. He notes that Defendant has already sacrificed

an invaluable asset -- his good name:

I have known Rabbi Menachem Youlus since approximately 2001. The crimes to which he has confessed in your court, deeply sadden and disturb me. As the rabbi of a community that experienced him, I am both hurt and betrayed. Yet I do recommend leniency regarding his sentence.

I brought Rabbi Youlus to my synagogue community in Westport CT, in 2006-2007. I saw his work on our Torah scrolls, including a Holocaust scroll, and his interactions with the youth and families of my congregation. I felt that he was of positive impact and good purpose. He did not take advantage of those opportunities in my community. He did not fund raise, or attempt to sell or market items to my members. This does not make him innocent. But it attests to the fact that he was doing good at the same time that he was breaking the law elsewhere. He was, and is, capable of great good. That is part of the tragedy, and a reason for leniency.

His crimes were possible because he had a good name, a reputation. In our religious community, that is everything. That reputation is destroyed now. He will never again have access to the world he betrayed. "Society" is immune from a recurrence of these crimes. What debt he has to pay, and how to pay it, is yours to determine as sacred trust, but I do not believe that we are at risk today.

In all of my dealings, he was always dependable and productive. When I hired him for services, they were rendered expertly and professionally. He continues to have skills that are employable in society for good.

I am not in position to understand or evaluate the psychological aspect of his crimes. Perhaps that is in order. But as one who has watched and known him for a long time, I do not believe that prison would add justice to this circumstance. I invite you to consider alternatives to incarceration, and to create a productive future for him to address his debts.

Exhibit 8 at 1.

Rabbi Avram Israel Reisner, the spiritual leader of a Conservative Congregation in

Baltimore, offers further perspective:

I am Avram Israel Reisner, Rabbi of the small Conservative congregation Chevrei Tzedek in Baltimore, Maryland and a colleague and acquaintance of Rabbi Youlus for some ten years. Rabbi Youlus was first introduced to me as a good friend of a Rabbi at another large Conservative congregation and the maintainer of the Torah scrolls. I found him to be a most unusual Orthodox rabbi and scribe, willing to be perfectly open and friendly to Conservative colleagues (not to be assumed, as there is substantial animus between the Orthodox and Conservative communities) and willing to share religious conversation with respect and complete amity. He has been the go to guy in caring for my congregation's needs as well, caring for the scrolls and supplying us with books and other religious paraphernalia. And always promptly,

with a smile, and with the best prices and service one could ask for. We are hard pressed to find another to replace him.

Rabbi Youlus is the father of many children, of whom the youngest is still a baby. He is a doting father and regularly attends to the children, as I have seen during visits to his home. During the last few years his health has deteriorated significantly, and he has continuing heart disease related limitations, as I am sure you know. I would ask that you please take that into consideration in determining an appropriate sentence.

I am aware of the crimes for which he has been found guilty. In fact, my congregation is the owner of two scrolls provided by Rabbi Youlus of dubious provenance. But the scrolls are ritually fit and were sold for prices that we felt and feel were proper and indeed a bit below market price for other scrolls in similarly good condition, such that the congregation does not feel itself to have been harmed. We trust that your judgment will be applied compassionately.

Exhibit 9 at 1.

The religious and lay leaders of Congregation Sharei Yerushalayim in Baltimore,

Rabbi Moshe Goldstein, Emphraim Goldstein and Marshall Levin, although all deeply effected by

the Holocaust, nevertheless believe that a custodial sentence would be too high a price for Defendant

to pay:

As victims of Rabbi Youlus, who purchased an alleged Sefer Torah Scroll from the holocaust we urge the Court to show the utmost mercy in sentencing, including foregoing or suspending any incarceration given the dire effect it would incur on innocent parties of the greater community. Rabbi Youlus demonstrates his remorse and any incarceration would cause undue suffering and punishment on his innocent young children and chronically ill wife. Our congregation, suffering from the natural humiliation and hurt of marketing our Torah as a relic from the holocaust views Rabbi Youlus potential jailing as nothing more than adding to the suffering, humiliation, and hurt of the greater community to which the Youlus family in other matters has greatly contributed.

As rabbi of our congregation which was founded based on preserving the legacy of our Sefer Torah, which we believed saved from the holocaust, pleads that whatever sentence given takes into consideration us as victims and his innocent family. As victims, incarceration would be extremely detrimental to my own family, congregation, and community which has attended school and participated in public service activities with the Youlous family. My own family comprises holocaust survivors-my wife's father is a survivor of the Vilna ghetto and her grandfather is a survivor of Dachau camp. Our congregation's president's living father survived Aushwitz. We therefore recognize the misrepresentation involved. Despite our

victimization, we feel strongly that having Rabbi Youlus incarcerated with the untold suffering such an outcome would have on his sick wife, children and our community is even more a punishment on the innocent, including ourselves. Once again we emphasize Rabbi Youlus deep remorse, restitution, and asset he has provided within our greater Jewish community.

Like many victims, our goal in purchasing our Torah was to not just memorialize those unjustly victimized in the holocaust through family separation, hard labor, humiliation, and incarceration but to worship with a kosher Torah with letters and words arranged to perfection. Rabbi Youlus went to great lengths to ensure our Sefer Torah was written accurately having professional known scribes check and recheck its genuine perfection. Our appeal to forego or suspend any incarceration is sincerely to avoid further hardship within our community, including Rabbi Youlus beloved innocent family with young children, friends, and ourselves as victims. We applaud the remorse and restitution that Rabbi Youlus undertakes and therefore urge you to make this central in offering a sentence that will not further punish given the untold suffering we along with his ill wife and children as a community have endured.

Exhibit 10 at 1.

Robert and Lynn Cale have also been identified as victims. Yet, "[t]his seemed rather odd to [them], since [they] have never considered [them]selves as having been victimized by him. [They] still do not, despite his recent guilty plea." Exhibit 11 at 1. Indeed, as the Cales explain:

At no time did Rabbi Youlus make any misrepresentation about anything we bought from him, including the Torah. We were never overcharged. If we ever bought a book from him that we did not like, we were always free to send it back for a full refund. The Torah was priced fairly; indeed, if anything, it was underpriced. Neither Rabbi Youlus nor anyone associated with him made any effort to declare or insinuate that the Torah we purchased was of any specific or special provenance.

*Id.*

The Cales offer the following anecdote to emphasize their point:

Many years ago, Lynn purchased a book from the Jewish Bookstore, but she did not examine it carefully. About three years ago she noticed that the book was flawed. Rabbi Youlus unhesitatingly took the book back and sent Lynn a copy of a newer edition without charge for either the book or even postage. The flawed copy was so old that Rabbi Youlus could not return it to the publisher for a refund, so that sale was a total loss for his store. Without belaboring the point, we have experienced numerous instances of Rabbi Youlus's kindness, honesty, and highly professional attitude.

*Id.*

The professed goal of the Cales in offering this letter was "not to minimize the charges nor trivialize the crimes to which Rabbi Youlus has pled guilty, but rather to emphasize his many good deeds and to implore that he be assigned a lenient sentence." *Id.,* at 2.[2]

Finally, Gretchen Kugel has been determined to be a victim of Defendant's offense. She, however, does not view herself that way. She states: "I study Judaism with Rabbi Youlus and my own congregational rabbis. In this regard, he has been the epitome of a good rabbi - a teacher: meeting me where I am, assessing my needs, abilities, and desires and suggesting appropriate books or subjects to study. He has always respected my background, which is not Orthodox." Exhibit 12 at 1.

With deep respect, when the Court considers the appropriate sentence to impose in this case, we submit that your Honor must also give serious consideration to those many victims who beg this Court *not* to incarcerate the Defendant. We respectfully submit that their gracious statements of compassion should weigh heavily on the mind and in the heart of this Court when deciding to impose a prison sentence on a frail father of nine who has no prior criminal record, who has accepted full and immediate responsibility for his crimes, who has made *full* restitution, and who poses no threat whatsoever to engage in any future criminal conduct.

---

[2] Notably, even in her victim impact statement provided to the Government, Lori Rosenberg stated that "[w]e purchased a high quality Torah Scroll at a great price from a fine man. We never once felt victimized and do not feel victimized now. On the contrary, we are very happy with our purchase. We are proud of our Torah Scroll and would not hesitate to buy another one from Mr. Youlus." Exhibit 78 at 1. Her letter to this Court is also therein provided.

V.     **Menachem Youlus' Sterling Background and Educational Pursuits**

A.     **Rabbi Youlus' Early Years, Education, and Marriage**

Rabbi Menachem Youlus was born in Manhattan on May 25, 1961 to Joshua and Eva Youlus, who relocated the family shortly thereafter to Monsey, New York. Joshua, who studied chemistry at Yeshiva and Columbia universities, and Eva, who studied biology at the University of Pennsylvania, had met in the labs of Columbia University while each was conducting cancer research.

In approximately 1972, Joshua Youlus lost his job in New York as a chemist. After a period of unemployment and with some financial assistance from Rabbi Youlus' grandparents, he eventually acquired ownership of a Jewish bookstore (aptly named, "The Jewish Bookstore") in Wheaton, Maryland. In order to be close to relatives, the Youlus family, which also included Defendant's younger sisters, Tamar and Adinah, moved to the neighboring town of Silver Springs, Maryland.

In Monsey and later in Silver Springs, Rabbi Youlus grew up in tight-knit, Orthodox Jewish communities, where he formed close friendships with fellow classmates -- many of whom now submit letters to the Court on his behalf. So it was natural, for example, that when twelve-year old Menachem Youlus was struck by a car in front of the local *shul* (synagogue), the community rallied around the Youlus family.

The family, too, was cemented by a close bond. As noted above, Rabbi Youlus recalls that "My grandmother, Sarah Landesman, would tell anyone willing to listen[,] "'I raised only Indian Chiefs, no Indians[.]' There was an unspoken rule that each of us children, grandchildren and great grandchildren were to be community leaders." Exhibit 2 at 1. Likewise, elderly members of the community worked closely, mentoring the younger members on leadership and community service.

Such was a theme that would transcend all of Defendant's subsequent educational training, first at the Ner Israel Mechina in Baltimore, where he attended high school, and later at the prominent Ner Israel Rabbinical School and Towson State University, where he pursued degrees in rabbinical studies and business, respectively.

After spending a year abroad in Jerusalem and an additional semester back at Ner Israel Seminary for specialized rabbinical training, Rabbi Youlus returned to New York, where he found work as an accountant. Within two years, however, in 1984, the course of Menachem Youlus' life was drastically altered when his father and brother-in-law were struck by a car as they left religious services one Friday evening -- coincidentally, at nearly the identical spot where he, himself, had been struck as a child. Rabbi Youlus' father suffered severe injuries and spent several weeks in the trauma unit of the hospital recovering from a crushed skull, among other debilitating injuries that would lead to irreparable memory loss and prevent him from ever fully resuming his responsibilities at the family bookstore.

As long-time friend, Stuart Schabes, remembers:

> In 1984, a terrible car accident occurred as Menachem's father and new brother-in-law were crossing the street on the Sabbath and were hit by a reckless drunken driver. Even though this accident occurred almost 30 years ago, I remember vividly the enormous amount of time Menachem spent in the hospital with his father who was gravely ill and with his brother-in-law while attending to the needs of his mother during this extremely difficult time.

Exhibit 13 at 1.

Maier Kutoff, Rabbi Youlus' brother-in-law, recalls living through that difficult period:

> I ended up with an epidural hematoma and my future father in law was incapacitated for months. As soon as he was able to Menachem came running from New York to Silver Spring, Maryland to help his father's store and allow my engagement to his sister to proceed permitting his father to recover without the stress of his business falling apart while recuperating.

Exhibit 14 at 1.

Several years later, though he had only temporarily assumed management of the bookstore during his father's recuperation, Rabbi Youlus was urged to return to the family business to undertake broader responsibilities. By that time, he had already met and married Rivka Lubin, and the young couple was beginning to raise a family in Baltimore.  Rabbi Youlus dutifully returned to the family business and has worked for his father at the bookstore since 1988.

Although, at present, Rabbi Youlus manages several divisions of the Jewish Bookstore, his true love, passion and calling has always been his work as a *sofer* (scribe) in writing or repairing Torah scrolls, for which he had undergone years of extensive training.  He was first introduced to the art of Hebrew calligraphy, or *safrut*, during his year-long trip to Israel upon graduating college.  When he returned home, Rabbi Youlus began working alongside his father and brother-in-law, Rabbi Allan Englander, at the Jewish Bookstore, where he was tasked with repairing and transcribing copies of the Torah, *mezuzot* (portions of the scriptures contained in ornamental capsules placed on doorposts in Jewish homes), *tefillin* (phylacteries worn by Jewish men during morning prayers) and other religious writings as part of his work as a scribe.

In the past twenty years, the Jewish Bookstore has purchased and sold countless Torahs, both old and new. Although the scrolls are usually examined initially by a third party vendor in order to ensure accuracy of the work, the Youlus family has continued the tradition of thereafter outsourcing any further necessary examinations as a way to provide other soferim in the community with work and to support their livelihoods.

**B.     Throughout His Life, Menachem Youlus Has Been a Giving, Generous, and Kind-Hearted Person Who Influenced Others in the Most Positive Ways**

The myriad letters submitted to the Court by friends and family of Rabbi Menachem Youlus paint the portrait of a fundamentally kind and caring man who, from an early age,

demonstrated the attributes which have endeared him to all who know him. The letters attest to an

individual who is extremely gentle by nature, exceptionally considerate of those in distress and

always offering a helping hand. Rabbi Youlus' mother, Eva Youlus, shares an example of her son's

early penchant for assisting others:

> From an early age, Menachem helped people. When he was in third grade, he
> persuaded us to take in a classmate whose mother was dying of lung cancer and
> whose father (a holocaust survivor) was unable to cope with the care of his young
> son. The boy stayed with us for six weeks during which time Menachem went out of
> his way to make life pleasant for his friend.

Exhibit 15 at 1.

> Defendant's high school classmate, David Fink, writes:

> As a High school student at Ner Israel, it was well known that if you had any
> questions, needed a favor or advice, Rabbi Youlus was the person to go to. He was
> not only willing to assist anyone in need, but did so in the kindest manner possible
> – always making it seem like you were helping him out by bothering him with
> something. I observed this conduct on his part for years, watching him aid countless
> students and myself, guiding us at every turn. Of course it meant a great deal to us
> that he was a top student, respected by his peers and the faculty.

Exhibit 16 at 1; *see also* Letter of Fred Gross, Exhibit 17 at 1 ("I remember him as a kind, good-

hearted, and loving teenager. He was always interested in helping others. When, while playing, he

saw that one of the boys was being ignored, he would go out of his way to befriend him, and have

him join the others.").

That extraordinary capacity for caring for others carried over into Defendant's

adulthood. As Robert Farrar, whose partner is a member of the extended Youlus family, summarizes

simply and succinctly, "[w]ithin his community, he was considered a 'mensch [literally, an

exceptionally fine person].'" Exhibit 18 at 1. It is a sentiment shared by many others who write to

the Court to share their experiences with Rabbi Youlus.

Marcia Miller's family has been patrons of the Jewish Bookstore for decades and has known Defendant "since he was a skinny little boy working in his dad's store." She writes, "If anyone would ask me to describe Rabbi Youlus, I would say he is a learned man and a gentle man with a good sense of humor and a wide, open smile. He is a man who is devoted to his family and loves them deeply." Exhibit 19 at 1. As another correspondent observes:

> I have taken great pride in watching him be the sexton in the small synagogue in which I often pray, and have marveled at his ability to make every person feel recognized and appreciated. This is an unusual talent, and as an educator of many years, I understand that this is only possible of his very essence is having a deep sense of dedication to the sensitivities of others.

Letter of Gary Krigsman, Exhibit 20 at 2.

Joseph Hefter notes:

> He is one of those people who truly cares about his friends and family and neighbors. Whether it is a matter of giving people rides to where they need to go, perhaps a place to stay, financial help when you are [in] need, helping in finding work, help in trying to find someone appropriate for your children to go out with, finding a Torah when you need one because of a joyous occasion (like a bar mitzvah) or a sad occasion (such as a death in the family), Menachem is the one you can always turn to for help.

Exhibit 21 at 1.

Others obviously feel the same. As Akiva Leiman states to the Court, Rabbi Youlus

> [s]till lights up a room when he enters, people gravitate toward him. This is no ploy; it is entirely sincere and in character. I see him nearly every day and rarely miss that opportunity for a chit-chat, a smile and a one-liner. . . . .

> [H]e is one of those souls who means well, who brightens a room, who adds to a community. In my view, [he] has no sly, cunning derisive side to him. He is as he appears to be: charming, polite and helpful. . . . .with [Rabbi Youlus] what you see is what you get.

Exhibit 22 at 2; *see also* Letter of Ari Gross, Exhibit 23 at 1 ("I would say, without any exaggeration, that Rabbi Youlus was someone who would, quite literally, give 'the shirt off his back' to help a friend and, sometimes, even to help someone he did not know").

Naomi Benyowitz has known Rabbi Youlus since she was 16 years old.   She

obviously agrees, believing "[t]his is his inner nature." Exhibit 24 at 1. She adds that Rabbi Youlus'

> very core demands that he be helpful and solicitous to all who seek his advice and
> countenance. Whether it is making time to help a customer in his business, provide
> aid to his elderly parents, act as an exceptional uncle to a developmentally-challenged
> nephew, listen to each of his 9 children, and be there as a help-mate to his wife,
> Rabbi Youlus is available. His guidance is invaluable. He has always been the
> epitome of selflessness and helpfulness and his example impacts my own visions to
> this day. Rabbi Youlus is a friendly guy, always trying to help people and better lives.
> He serves his community with distinction and mentors kids in school.

*Id.* at 1-2.

Perhaps those who have best observed Rabbi Youlus' kind, caring and solicitous

nature first-hand are, most importantly, his children. Aryeh Youlus writes of his father:

> It was not only family that my father consistently helps out. Any[]body in the
> community can attest to the fact that if they needed something and my father was in
> a position to  help he would do whatever it took to help them. . . . His generosity and
> kindness is a never-ending lesson for me.

Exhibit 25 at 2; *see also* Letter of Defendant's daughter E. Y.[3] Exhibit 26 at 2.

The letters thus speak forcefully of the universal understanding that Rabbi Youlus

will always provide a helping hand to whoever may be in need of assistance -- even with respect to

strangers. As one friend, Page Thomas, observes, Rabbi Youlus "is a deeply kind man with a good

heart and an irresistible urge to make peace between people and to help them." Exhibit 27 at 1.

Defendant's friend, Rabbi Aaron Lopiansky, recalls one particular incident in which

a young man walked into the Jewish Bookstore. According to Rabbi Lopiansky, the stranger

> felt instantly at ease, and began unburdening a family issue that was weighing on
> him.  This young man's family was being torn apart by a terrible conflict, and it was
> distressing him terribly.  Rabbi Youlus got involved and invested weeks of his time.
> He suffered verbal abuse, and an endless stream of tirades in an effort to resolve the
> issues.  He did this faithfully, pro bono, and never lost his calm!

---

[3] Redacted pursuant to this Court's  rules. Unredacted original to be provided at the time
of sentencing.

Exhibit 28 at 1.

Rabbi Lopiansky also recalls how, in a separate incident, he asked Rabbi Youlus to hire two young individuals who were grappling with emotional distress in the hope that the work would help them overcome their personal adversities.  Rabbi Lopiansky writes,

> He agreed both times; the only stipulation being that they not harm the business.  But, though they may not even have been productive enough to earn their salary, he was fine with hiring them, as a way to help their recovery.

*Id.* at 2.

Indeed, according to many correspondents, Rabbi Youlus' selfless beneficence simply had no bounds. *See* Letter of David Kramer, Exhibit 29 at 1 ("Even more recently, he defied his medical doctor's order and from his hospital bed [due to his cardiological condition] continued working on a project to publish and promote a book written by a member of my family"); Letter of Gary Krigsman, Exhibit 20 at 1-2 ("I still recall vividly when the son of a widow, who was an acquaintance of his, was having great difficulty in school. Rabbi Youlus went to bat for this young man, investing hours of time and great energy to make whatever accommodations necessary to help this young man succeed.  His love for his fellow man would not allow him to rest until the matter was worked out to everyone's attention"); Letter of Victor Lipnitsky, Exhibit 30 at 1 ("I recall how a friend of ours . . . had a really awful argument with his future parents-in-law who refused to attend their daughter's wedding.  Menachem spent weeks trying to organize his wedding and bring about peace between him and his future parents-in-law.  I remember asking myself back them why does he need to put so much effort into things that shouldn't concern him and the only answer I could think of was that Menachem Youlus really cares."); Letter of Avrom Landesman, Exhibit 31 at 1 ("As someone involved in several charities, I can recall numerous instances of Rabbi Youlus referring people for help with a variety of financial, marital or personal problems.  Usually, the

people he has referred came to his attention in the bookstore he helped manage.  He takes a personal

interest in his customers far beyond what is normal for a commercial connection").

Similarly, Rabbi Youlus' long-time friend, Stuart Schabes, notes:

> I would also like to provide insight regarding Menachem's continued acts of kindness and charity in the Greater Jewish Community and elsewhere.  He continues to be virtually the first one to greet a newcomer into the community let alone into the Synagogue. His warmth and care is quite admirable. He is an integral part of a local Synagogue and the Rabbi relies on him in so many ways regarding the functioning of the services and its operations.

Exhibit 13 at 2.

Rabbi Shmuel Herzfeld, leader of the 300 family National Synagogue in Washington

D.C., was "spiritually nourished" by Rabbi Youlus when he was "in a dark moment." Exhibit 32 at

1. Adding that "what he did for me he did for so many others in our community," *id.*, Rabbi Herzfeld

notes:

> I have personally seen him inspire people to believe in themselves again and to acts of goodness and kindness. I have watched him comfort mourners and bond with people at life cycle events. I have often sent people to him for guidance and he has always guided them with care and sensitivity.

*Id.*

Judith Bregin purchased a Torah Scroll from Rabbi Youlus to memorialize her

husband who had passed away, which is used by many families in the community. She notes that

"Rabbi Youlus also checks the Torah scroll every time it is returned to ensure its validity and fixes

it as needed. I offered to pay Rabbi Youlus for this service, but he refused to take any money from

me." Exhibit 33. She adds:

> On a personal note, I know Rabbi Youlus as a person who is always willing to go out of his way and to spend as much time as needed to help others. After my husband passed away, Rabbi Youlus was always available to discuss educational issues with me and to speak on my behalf to my children's school administrators. His sincere involvement was extremely helpful.

> Because of all the good things that Rabbi Youlus has done over the years for the Baltimore community and for my family in particular, I ask Your Honor to impose the most lenient sentence the Court considers to be appropriate.

*Id.*

Finally, as many letters point out, in the Orthodox Jewish community one of the most important contributions a member can provide to one's neighbors is facilitating a successful marriage. In that respect, Rabbi Youlus has earned a reputation as a dedicated matchmaker. Daniel and Michal Balsam write from personal experience:

> Rabbi Youlus has long involved himself in shidduchim (matchmaking), which is viewed in Jewish tradition as a kindness of the highest order. We saw this firsthand in the case of Michal's sister . . . . Until she became engaged in 2010, Rabbi Youlus was continually trying to find an appropriate match for her and offered a number of suggestions.

Exhibit 34 at 2; *see also* Letter of Robert Goodman, Exhibit 35 at 3 ("As a friend, he has tried setting me up with single Orthodox women he knows as I am single and have never been married"); Letter of Nancy Goodman, Exhibit 36 at 1 ("Rabbi Youlus was a kind, listening ear as I shared with him some of my experience of my daughter going through the 'match making' process in the Orthodox Jewish community as the mother of a young woman looking for an appropriate husband. He offered to help find appropriate matches."); Letter of Joyce Dreyfuss, Exhibit 37 at 1 ("In my personal knowledge and experience, Rabbi Youlus has been directly involved in bringing together couples for the purpose of marriage and has succeeded in several instances."); Letter of Carole Fuchs, Exhibit 38 at 1 ("Menachem assisted many, many young people in finding suitable mates. Some of these young people would otherwise have found it very difficult to find an appropriate match. Menachem became very involved in the marriages of some young people, so much so that in one case, he and his wife escorted a bride down the aisle."); Letter of Yocheved Mizel, Exhibit 39 at 1 ("On several occasions, Menachem and his wife called me to invite me to their home in Maryland because he was

worried that I was feeling lonely. He also made efforts to introduce me to young men from his community. The man who would eventually become my husband was one of those Menachem had suggested I meet. I was extremely touched by these gestures and came to see him as a kind person who is willing to take time out to help others.").

Simply stated, Menachem Youlus is a fundamentally kind and decent man. Indeed, with the exception of his quickly admitted transgressions in this most tragic case, he has consistently demonstrated, through a lifetime of unlimited generosity and good deeds, what it means to be an exemplary family man, friend and neighbor.

### C.    Menachem Youlus Has Devoted Endless Attention to Children With Special Needs

Rabbi Youlus has consistently striven to teach his children to be kind to others, most often by example. Michael and Ellen Edinger explain to this Court how, when their then-13 year old son was struggling to make friends in school, Rabbi Youlus warmly invited their son to his home in order for him to befriend Rabbi Youlus' own son. *See* Exhibit 40 at 1.

Similarly, Sherry Berlin, who has a daughter with special needs, writes of how, from the time her daughter was in kindergarten, Rabbi Youlus had arranged regular play dates so that their daughters may spend time together. As she explains:

> What Rabbi Youlus did to foster my daughter's emotional and social growth reflects his caring heart and his inner drive to perform acts of loving kindness to enrich the lives of the "special" people in our midst (when most people would choose to ignore). If someone he knows is suffering or in need, Rabbi Youlus will devote himself to alleviating at least some of the person's anguish in some tangible way. Community service is a way of life for Rabbi Youlus as he often takes time away from making his livelihood to help someone he knows needs his help.

Exhibit 41 at 2.

Sherry Berlin and Michael and Ellen Edinger are but two of the many individuals who note Defendant's unique ability to cultivate relationships with children with special needs. The following individuals make similar observations: Judy Landesman:

> Menachem was one of several people who were influential in helping us provide a normal environment for our oldest daughter, then in her early teenage years, who was born with CP and is still dependent in all activities of daily living. Menachem spent lots of time talking to her, playing games with her and always treated her as a regular young person.

Exhibit 42 at 1;

> Shifrah Garsek:

> Mr. Youlus is caring and friendly to all children with special needs. I know he has visited classrooms and has given talks to such children. The teachers love the way he interacts and have brought him back again and again. Menachem always has a friend's help and witty line . . . it is easy for them to feel the love and recognition in his greetings.

Exhibit 43 at 1;

> Dr. Jonathan Lasson:

> I have observed Rabbi Youlus taking a keen interest in the mental health issues that affect his neighbor and community.

Exhibit 44 at 1; and

> Rabbi Joseph Lipschutz:

> I believe I know Rabbi Youlus very well and can testify to the goodness of his heart and his sterling character. He always empathized with the more unfortunate friends of ours: children from dysfunctional families, orphans, and those with physical handicaps.

Exhibit 45 at 1.

Notably, of the almost 200 letters addressed to the Court, the underlying theme in each is a testament to Rabbi Youlus' kind and sensitive nature, and the ways in which he has

undertaken countless acts of beneficence for others without any expectation of reciprocity. David

Fink has known Rabbi Youlus for over 32 years, and writes from experience:

> Whether it was children with special needs, a local Hebrew school or people in need,
> it was nearly impossible to work with any organization where Rabbi Youlus was not
> already giving substantially of his time and resources.  Once again he was often the
> voice of good conscience and reason and instrumental in helping so many people. .
> . . All of this care has always been shown with absolutely no fanfare or desire for
> personal gain.  On the contrary, Rabbi Youlus' interest in helping people has always
> been done in the most modest ways conceivable, choosing to remain anonymous and
> in the background.

Exhibit 16 at 2.

### D.     Manager of the Bookstore and a Member of the Community --
### The Bookstore Becomes a Center of Community Charity

Rabbi Youlus' presence in the community is inextricably tied to his role as the

manager of his father's local Jewish bookstore. As the letters establish, he has extended the same

dedication and focus toward helping his patrons and customers, familiar and unfamiliar, as he does

to his own family, friends and neighbors. They give the impression that Rabbi Youlus regards his

role as not only that of a bookstore manager, but also as a friend and, when necessary, as an advisor.

Marshall Breger, a law professor at Catholic University who has known the Youlus

family for 25 years, offers an observation that is echoed by many customers of the Jewish Bookstore:

> In these visits to the bookstore, we always saw Menachem dealing generously and
> kindly to all comers.  Many people came to the store not to buy, but to talk and ask
> questions about Judaism and religion in general and Menachem was always
> remarkably patient, open and welcoming to all, whether or not they purchased
> anything, so that many on different, spiritual quests and journeys would feel
> comfortable returning to talk further.

Exhibit 46  at 1.

Rabbi Yitzchak Breitowitz, a former law professor at the University of Maryland, is

the Rabbi for the synagogue attended by members of the Youlus family. He paints the portrait of a

most ecumenical side of Rabbi Youlus:

> Menachem is man who has done a tremendous amount of good for countless people. He is generous not merely in a financial sense but with his time and energy.  He was always willing to take time out of his business to explain the tenets of Judaism to beginners, to extend the hospitality of his home to all who needed it, to offer an encouraging word to people who were troubled or felt rejected by life. . . . His store became an intellectual salon of sorts where people from different walks of life and religious commitments could meet and share ideas in a comfortable, nonjudgmental environment.  There are not too many places where a Chassidic rabbi might be found engaging in a dialogue with an Imam or a priest but Menachem's store was one of them and fundamentally his open, accepting personality made it so.

Exhibit 47 at 1.

Jeremy Kay, a publisher at Bartleby Press who has known Defendant for over 30 years, writes:

> I have also observed him with many others who have walked through the doors of his bookstore seeking guidance about a particular book or perhaps a religious object. I have also seen him offer comfort to those who are having difficulties and look at the bookstore as sort of [a] "walk in" spiritual center. I have seen him do these things when he didn't know anyone was watching. I also know of the many who hold him in very high regard as a religious authority both in the Washington area and in Baltimore.

Exhibit 48 at 1.

Others also comment on Rabbi Youlus' generosity as a storemanager, including Robert Goodman, who writes extensively of the many occasions where Rabbi Youlus had gone out of his way to provide him with discounts on all manners of religious writings.  Like so many others, Mr. Goodman also declares unequivocally that "Rabbi Youlus is a 'mensch.'" Exhibit 35 at 1.

Michael Kohen is a member of *Shoresh*, a local organization that strives to help its members build Jewish identity. Mr. Kohen writes of the many occasions that Rabbi Youlus spent with him, providing not only guidance to the organization's mission, but also *time* that many other prominent members of the Jewish community were not willing to spare:

> What stands out however, at least to me, was the fact that he was the only person willing to meet with me and help me. Rabbi Youlus received no benefit from helping me -- he was not connected to Shoresh -- we were not really friends.  This was just

the simple good deed of helping someone out with no strings attached and no rewards on the back end.

Exhibit 49 at 2.

Importantly, Defendant's customers write of his integrity as a store manager. According to Ruth Alpert,

> Menachem Youlus did not personally gain in any way from the assistance and referrals he gave us - referrals to other professionals who could be of service to us. He took time away from earning a living for his family to spend time with us and provide us with help we desperately needed. That is the Menachem Youlus we have always known- a person who can be selfless to a fault - even when it costs him time and money.

Exhibit 50 at 1. Others write similarly: *See* Letter of James Karesh, Exhibit 51 at 1 ("He has always been more than fair in determining and explaining an item's price.  I have never felt misled by anything that he has said about a particular item. He has never exhibited any behavior that has suggested anything other than scrupulous honesty."); Letter of Joel Gross, Exhibit 52 at 1 ("I never felt any pressure to buy things I didn't need.  In fact, Menachem on more than one occasion suggested I not buy certain items I was considering because they would not in his opinion be of good value for me.").

Rabbi Richard Bernstein, who has known Rabbi Youlus for 33 years, sums up his friend's role in the community:

> Rabbi Youlus has demonstrated time and time again a capacity to provide assistance to those in need.  He has mediated family conflicts, has been [a] source of charitable resources to those less fortunate than himself and has educated his community about the sacred traditions they possess.

Exhibit 53 at 1.

Rabbi Youlus has also consistently demonstrated remarkable kindness and empathy toward the Jewish Book Store's employees. Royal Fuchs, whose wife was formerly employed at the Jewish Bookstore, writes:

> Rabbi Youlus was a leading factor in employing a man with multiple chronic illnesses and saw to it that he had continuous medical insurance coverage and sustenance. He kept this man employed until such time as the man was unable to perform meaningful tasks at the bookstore on a continuous basis. Rabbi Youlus ensured that the man had medical insurance coverage for several months after his severance from the bookstore. This act of kindness allowed the man to have critical surgery without incurring substantial indebtedness and provided time for him to find means of support[.]

Exhibit 54 at 1.

While Rabbi Youlus' friends and customers write exhaustively of his spiritual and financial generosity, those who have worked alongside him in the bookstore are able to offer the best insights. They include Carole Fuchs, who suffers from chronic asthma and was hired by Rabbi Youlus and his father when every other potential employer was convinced her illness would impede her work, Exhibit 38 at 1, and his brother-in-law, Rabbi Englander, who is able to personally attest to what he has witnessed every day for over 20 years as he worked alongside Rabbi Youlus:

> Even professionally, he has given his heart and kindness over to people in need. He permitted an acquaintance to house 10 personal Torah scrolls in the store, for years, free of charge, simply because "he had a bad heart condition and needed the favor." I have witnessed him extend credit to people (interest free) for months, enabling them to buy the religious items they needed but couldn't afford at the time. He has regularly delivered people or items from Baltimore (his residence) to Washington (place of business) or vice versa just to do someone a favor. He has also arranged to repair people's Torahs or other religious artifacts either free or at minimal cost, just to help a fellow Jew who was down on his luck and needed a boost.

Exhibit 55 at 1.

Indeed, Rabbi Youlus' extraordinary dedication to, and respect for, his colleagues and neighbors is perhaps made most apparent by the letter of Eli Robbins, an attorney whose family also owns a Jewish Bookstore, Perns. Mr. Robbins writes to the Court of how, upon the death of Mr. Robbins' father over 20 years ago, Rabbi Youlus helped keep Perns afloat during the busy Passover season:

Menachem Youlus quickly stepped into the breach and, along with a friend, ran Perns during this critical and tumultuous time.  The customers were served, the business was not lost, and most importantly, we as a family knew that someone had our back. Menachem did not seek compensation for running Perns during this time, and as far as I know, never received anything more than a heartfelt thank you for stepping up when he did.

Menachem did not view his mission as being accomplished when my mother finally took over Perns after Passover[.]  Rather, Menachem continued to look after Perns, even after starting to work in his own family's Jewish Bookstore down the road in Wheaton, Maryland.  Despite the fact that Perns and the Jewish Bookstore are technically in competition with each other, Menachem continues to provide my mother with advice and ideas to improve the efficacy and profibility of her store.  The fact that both Perns and the Jewish Bookstore are, to a certain extent, marketing to the same niche customer base is irrelevant.  Menachem saw a need way back in 1981, took responsibility to fill that need, and has not relinquished that responsibility in over 30 years.

Exhibit 56 at 1-2.

E.     **Menachem Youlus' Conduct in this Case Represents a Stunning  Departure From an Otherwise Unblemished Life**

Those who know Defendant the longest, including persons in relationships with him that have been fostered over Rabbi Youlus' entire lifetime, are best able to offer sincere insights to the makeup of his personality and the otherwise innocuous characteristics which, in a perfect storm, would eventually lead Rabbi Youlus astray. They write of a schoolboy who, by way of overcompensating for his lack of athletic ability, would attract friends, not only by his great sense of humor, but perhaps most tellingly, by his talent for storytelling.

This perspective is certainly shared by Rabbi Youlus' psychologist, Dr. Daniel Nothmann, who writes to the Court of Defendant's "lifelong pattern of self-aggrandizement, embellishment and lying. The chronic nature of his behavior has been confirmed by relatives who have known him since childhood." Exhibit 1 at 1.

*Most respectfully, we pause to emphasize, in the strongest of terms, that by no means do we provide this analysis to the Court as an excuse or legal defense of Rabbi Youlus' criminal*

*actions for which he has accepted full responsibility*. Rather, this concern is raised so that the Court might perhaps better understand the pattern of seemingly innocent life-long behavior which, perhaps inevitably, led Defendant down what has proven to be an obviously self-destructive path. Indeed, Dr. Nothmann specifies that "[t]he underlying aim of his lifelong pattern of lying seems to be to improve how others see him." *Id.*

> Dr. Nothmann adds:

Treatment has consisted of exploring underlying factors that contribute to his lying. He has become increasingly aware that there is often a secondary gain to this that it will often lead to him feeling good in various ways, often feeling better about himself. Because of this, his pattern of lying in order to feel better has an addictive quality to it. The underlying aim of his lifelong pattern of lying seems to be to improve how others see him. This is in contrast to people who lie for purposefully manipulative or psychopathic reasons.

Unfortunately, he has been disconnected from the consequences of his lying, which has tended to impair his judgment rather significantly at times. However, he realizes that simply understanding reasons he engages in this lifelong pattern does not excuse his behavior. He accepts responsibility for his  actions, realizes what he did was wrong and is working on increasing his empathic understanding of the victims of his behaviors.

He has worked on implementing various steps to decrease his lying. He recognizes he has to be very careful because his pattern of lying is so insidious and chronic and therefore he must be very vigilant to guard against it. He needs to continue to work on his habitual patterns of embellishing the truth and lying to others. Moreover he continues to actively work on reflecting on his choices and the things he says as well as getting feedback from others who are close to him with respect to his telling the truth or not.

*Id.*

> Rabbi Yaakov Hopfer, Defendant's other confidante, long-time mentor and counselor, views him similarly:

I know that the court recognizes that Menachem Youlus is a person with major emotional problems. In my work with him we have spent much time discussing the crimes he has committed. We have spoken at length about the fraud he perpetrated, consistently and brazenly deceiving his trusting customers. We have also discussed how he has manipulated the most hallowed sensitivities of our people in his gross

misrepresentation regarding the Holocaust, preying upon the feelings and vulnerabilities of survivors of this epic tragedy of our people. I can say with confidence that he now recognizes the gravity of those crimes and feels genuine remorse for his actions.

Exhibit 78, at 1.

So understood, Defendant's unquestionable criminality stands "in stark contrast to people who lie for purposefully manipulative or psychopathic reasons." Exhibit 1. This observation is corroborated by many of Defendant's closest friends. In his letter to the Court, Rabbi David Finkelstein, who has been close with Rabbi Youlus for 35 years, describes Defendant's personality when he was a young man. Rabbi Finkelstein speculates on the genesis of what became a chronic pattern of hyperbole and embellishment:

> He was never athletic or stood out in a crowd. He was your basic, average nice guy. Even in high school, when he would tell a story, he would embellish. His friends all understood this as him wanting to feel a little more important and to make himself a little more noticeable. It was harmless, and we put up with it because he was such a super, nice guy. He obviously was affected by his childhood in a deeper way than any of us understood.

> He obviously made some bad choices. Honestly, I feel that this is not the Rabbi Youlus I know. I feel he needs some professional counseling to help him understand the root of his problem, which as I stated before, I feel goes back to his early childhood. I don't feel he would ever harm anyone because of a mean spirit, just misguided. Somewhere along the way, perception and reality became crossed.

Exhibit 57 at 1-2.

Others agree. *See* Letter of Ari Gross, Exhibit 23 at 1 ("He had a great sense of humor and was a real good storyteller. I remember some of the stories he told, and how entertaining they were. Is it possible that sometimes a story would get embellished for more dramatic effect? Absolutely. Was the intent [back in those days] ever to hurt someone or their reputation? Absolutely not."); Letter of Rabbi Yehuda Fleischmam, Exhibit 58 at 2 ("In a way, I can perhaps picture Rabbi Youlus as a person whose lively, childlike imagination ran away with him, causing him to victimize

others a[s] well as himself with his own fairy tales"); Letter of Rabbi Sander Goldberg, Exhibit 59

at 1 ("I believe he suffers from a pathological disorder, which is, he makes things up that are not true

that are self-aggrandizing.  I think it is quite possible that after he has invented a story about: who

he knows, where he's been, what he has done, what he is capable of accomplishing, etc. he may very

well come to believe it!").

        Perhaps one correspondent put it best:

> I would suggest in the strongest terms that this is a man who requires professional
> help.  He has certain delusions, issues with reality that are psychological in nature.
> Prison will be the worst place for what ails him; this is a man who has contributed
> much to his community and will continue to do so, if he can get proper treatment.
> From knowing him as well as I do and for as long as I do, I can assure you that he
> meant no harm to anyone he might have mislead. Rather, it is his difficulties with
> grasping reality that caused him to embellish the true sources of his torah scrolls and
> his foundation.

Letter of Uri Landesman, Exhibit 60 at 1-2.

        Despite Rabbi Youlus' penchant for hyperbole, his friend, Jeremy Kay, notes:

> True, I have observed him weave stories that seemed a little over-embellished and
> are likely similar to those that have brought him to his present difficulties and the sad
> situation that he has created for those involved.  However, in my experience, I never
> noticed a single instance when he sought an advantage from those exaggerations.  In
> fact, they seemed superfluous and unnecessary.

Exhibit 48 at 1.

        There appears to be a consensus among all who know him well, therefore, that the

uncharacteristic behavior which brings Defendant before a United States District Court to face

sentencing upon a conviction of mail fraud is not reflective of the person they know him to be --

many for decades upon decades. *See* Letter of Nathaniel Landesman, Exhibit 61 at 1 ("There is no

malice in Rabbi Youlus. The incidents for which Rabbi Youlus has taken responsibility are not

reflective of his general demeanor."); Letter of William Pieprz, Exhibit 62 at 1 ("These crimes do

not so much represent a flaw in his character but rather represent a departure from his true

character.").

Unquestionably, the fact that Rabbi Youlus' criminal conduct dramatically departed from his otherwise unblemished reputation has truly bewildered his community. Rabbi Youlus' uncle, Avrom Landesman, writes:

> The transaction that gave rise to Rabbi Youlus' conviction are not reflective of his normal character or his normal business dealings. Without intending to belittle the gravity of the offense for which he accepts responsibility, it should be noted that he[] has enjoyed a wonderful reputation in th[e] past for honesty and trustworthiness.

Exhibit 31 at 1-2.

Marjorie Edelman, who has known the Youlus family for over 25 years, concurs:

> What Rabbi Youlus has done is completely uncharacteristic of the man we have known all these years and the good things he and his wife Rivka have done for so many people in our community.

Exhibit 63 at 2.

Rabbi Youlus' friend, Rabbi Yehuda Lefkovitz, likewise observes:

> Knowing of his involvement in our community in such a positive way has sent shock waves to so many of us who have respected him and have considered him a dear friend and colleague. He has done so much for so many that we are at a loss for words.

Exhibit 64 at 1.

Ruth Alpert, who has known Rabbi Youlus for decades, further notes:

> While what Mr. Youlus did was reprehensible, it is doubtful in our minds that he set out to hurt anyone. It is our belief that Mr. Youlus got carried away with his "mission" to save old Torahs and to find them a home and a new use. Unfortunately, rather than elevating his work and mission, [it] did quite the opposite.

Exhibit 50 at 2.

Finally, Gretchen Kugel, writing from the perspective of a contributor to SATI, and hence, someone whom the Government views to be a victim, does not see things much differently:

> There are some bruised egos and red faces in the Jewish community by those who

purchased these Torah scrolls. No doubt there is anger as well. As I recall from earlier reports, all the Torahs in question were independently authenticated to be pre-War and European, although no one could tell for certain that they actually survived the Holocaust. All were properly restored and rendered kosher - fit - by outside sources. No lives were lost. The trust broken and shame visited on Rabbi Youlus cannot be undone and he lives with that. The heart attack he suffered during this time and damage done to his heart -literally and figuratively remains. To me, the deepest hurt must be to Rabbi Youlus' wife and mother, who are the very two who have asked me (and other friends) to write seeking leniency. If they can ask that, then I can petition the court for leniency in sentencing. All these conflicting thoughts and feelings have made it difficult for me to write. This is not a clear cut case because it involves someone I consider a friend, teacher, and mentor and a crime I know is wrong. However innocently it began, it ended badly. Not that I'm so great, but I have had temptations and money worries and have not done this.

Exhibit 16 at 2.

**F.   As Even His Community, Which Continues to Support Him, Fully Recognizes, Rabbi Youlus Has Demonstrated Extraordinary and Unceasing Remorse For His Criminal Acts**

As it is written in Ecclesiastes 7:1, "A good name is better than precious ointment . . . ."[4] The truly astounding grouping of almost 200 letters that accompany this memorandum make abundantly apparent that Rabbi Menachem Youlus has led an extraordinarily charitable and wholly selfless life. Such recognition, having been a badge of honor and a source of unceasing pride, Defendant's acknowledgment of just how far he had departed from the sort of conduct that had been the hallmark of existence only heightens the deep remorse from which he suffers for his regrettable actions.

In this regard, Rabbi Yaakov Hopfer, a mentor and advisor of both Defendant and his wife, Rifkah, explains this most starkly:

> Since Menachem's crimes have been exposed, Menachem and his family have suffered a great deal. They live in the heart of our very tight-knit Orthodox community, which is a "neighborhood" in the fullest sense of the word. The lives of the families in our community overlap and intersect in countless ways, as individuals

---

[4] Meaning: In preserving one's legacy after death, a good reputation is better than the ointment used to preserve the body.

attend prayer services together daily, share weekly Sabbath meals, send their children to the same schools, and carpool with neighbors. Since Menachem's fraud has been exposed he has experienced constant shame and he has been unable to properly interact with members of the community that he has deceived. He cannot look long-time neighbors in the face. This is surely deserved, but it is important to note that it is a significant price that he and his family are already paying - and will continue to pay - for his crimes. I fully expect that given what he has done, whatever the outcome of his trial he will never again be a member in good standing of his community. He and his family will continue to suffer the consequences of his actions.

Exhibit 78, at 1-2.

The letters make clear that the collective disappointment in his community over Rabbi Youlus' conduct is surpassed only by the disappointment and shame that Rabbi Youlus feels for himself. As Avrum Kowalsky observes:

> Rabbi Youlus' criminal behavior is so at odds with his general integrity, that when the charges against him became a matter of public record those who know him were shocked to learn of his corruption. His communal persona stands in sharp contrast to his wrongful activities as he has been a staunch civic and public leader. He is a principal member of his Congregation, a teacher and an example of positive religious life. All this, he has torn asunder, and the guilt which he bears is almost too much to witness. He is muted and downcast, remorseful and sorry; and seeking and grasping at ways to evidence his rehabilitation and demonstrate his absolute and steadfast resolve to never again violate the law and abuse the trust of patrons, family and friends.

Exhibit 65 at 2.

Alan Kelman writes:

> I am stunned to have learned of his crime and guilty plea, as this is so in contrast with what kind of person I know him to be. Every one of us has our challenges in life and so often, we fall prey to them. I personally know how regretful he is for this, and the dire impact that this chapter in his life has had on his family, and caring, loving friends of his, such as myself. Rabbi Youlus has been physically sick over this, and I really think that it is his true regret over his behavior (rather than the regret of having gotten caught) that is hurting him.

Exhibit 66 at 1-2. Rabbi Hopfer obviously agrees. *See* Exhibit 78, at 2 ("Menachem Youlus has committed real crimes. He recognizes and acknowledges his guilt, and is genuinely remorseful not because he has been brought to justice, but because he has long since come to fully appreciate the

depth of the pain and suffering he caused to so many others. He is suffering and will continue to suffer as a result of his actions.").

To be sure, a number of Rabbi Youlus' friends and family have remained steadfast in their support. Despite his criminal conduct, he is still held in high regard by those who truly know him. In many ways, it is a testament to Rabbi Youlus' fundamentally decent nature. It is also an acknowledgment of the complexity of his character, and that Rabbi Youlus' actions were but a regrettable aberration from an otherwise honorable life.  Now, at the watershed moment of Rabbi Youlus' life, friends observe that "[h]e has found the strength and courage to continue in his warm friendly ways even since his indictment while enduring the pressures of a trial and an uncertain future. He has not turned his misfortune into the burden of others."  Letter of Dr. Jonathan Baron, Exhibit 67 at 1.

Importantly, the strength of his character has allowed Rabbi Youlus' friends to hold an abiding faith in his redemption. David Fink shares the following:

> As a trial lawyer who has seen my share of criminals, I am naturally cautious with whom I allow my children to socialize or be alone with.  Rabbi Youlus and his family are among those people.  Even with these errors, he remains in my highest regard and I would not hesitate to trust him with my life.  It is an honor to count him among my friends.

Exhibit 16 at 2; *see also* Letter of Rabbi Stan Levin, Exhibit 68 at 1 ("Even with crimes for which he has been convicted, for which he has great regrets, I remain a loyal friend of Rabbi Youlus and I respect him for his knowledge, his warmth, and all his years of service");  Letter of Naomi Benyowitz, Exhibit 24 at 2 ("Rabbi Menachem Youlus is a special person. A special person who has fallen off the track right now, but, will hopefully regain a firm footing and regain his life of good deeds, hard work and community service.").

Most importantly, Rabbi Youlus' children have not lost faith in their father. One of

his oldest children, Aryeh Youlus, writes:

> I am aware of what my father has been convicted for and pleaded to but this has not altered my unwavering respect for the kind of person he is. He is a genuinely righteous and kind person and has had deep regret for anything he has done wrong to anybody. I am sure that because of the person he is, he has already changed and improved himself.

Exhibit 25 at 1.

As Rabbi Chaim Goldberger suggests, even at this difficult juncture in their lives, Menachem's children still have something to learn from their father:

> [Rabbi Youlus' children] need a father's presence to insure that they will not be tempted to fall into the trap of moral weakness due to a lack of firm, fatherly guidance at the critical developmental moments in their lives during which it will be needed most. His experiences and the lessons he has learned will be exactly what his children will need to hear from him all through their growing years, in order that they should not grow up to repeat their father's mistakes thanks to his absence from their lives.

Exhibit 69 at 2.

Crucially, we note that, regardless of whether others would have chosen to forgive him, Rabbi Youlus' own remorse is clear. Moreover, his guilt and consequent shame for his criminal conduct, and the betrayal of his customers, has been exacerbated by the harm which he understands he has placed upon the members of his own family. A earlier noted, it is, Rabbi Youlus well recognizes it to be "a burden that I must carry for the rest of my life." Exhibit 2 at 2.

Defendant's sister, Tamar Englander, describes her brother's struggles over the last several years:

> [I]n a sense the past two years have been a sort of "prison sentence" already to Rabbi Youlus as well as to his entire family. . . . [H]e has already grown immeasurably from this entire ordeal, particularly through the advice and intervention he has sought from his doctors, Rabbis, and lay leaders in the community. The ones who truly stand to suffer from a prolonged punishment and separation are his family members- whos[e] fragile sense of stability stands to topple, perhaps requiring years of extensive rehabilitation or worse.

-38-

Exhibit 70 at 1.

Avrom Kowalsky adds:

He is full of remorse, and regrets terribly what he has done to violate both the letter and spirit of the law. Confronting his behavior brings tears to his eyes, and Rabbi Youlus finds it most difficult to face family or friends without severe and wrenching embarrassment.  He has expressed to me and others a burning desire to repent and hopes and prays only for a chance to demonstrate that he has corrected his ways.  In that vein, he wants too much to redeem himself in the eyes of the public and most importantly in the eyes of his parents, wife and children.

Exhibit 65 at 2.

Finally, Dr. Lasson states:

Rabbi Youlus is already a broken man in need of repair. He will not be able to repair his reputation in earnest by serving a lengthy sentence. He has a large family and circle of friends who greatly depend on his steadfast commitment to family and community.

Exhibit 44 at 2.

**G.    Counsel Now Holds the Sum of *$862,044.33* in Escrow, in Full Compliance With Defendant's Financial Obligation Under the Plea Agreement**

As indicated above, and amounting to the life's savings of Defendant's elderly parents, counsel is in possession of the full sum of $862,044.33, which Defendant, as part of the plea agreement, has agreed should be forfeitable to the Government. At the time of the plea, however, this Court indicated, and the Government readily concurred, that, rather than being forfeited to the Government, any monies paid should be directed toward the designated victims. Functionally, therefore, the monies are to be utilized for restitution. Counsel is prepared to distribute such monies as soon as directed by the Court.

**H.    The Youlus Family Will Suffer Greatly in Rabbi Youlus' Absence**

Rabbi Youlus and Rivka Youlus have lived in the same home in Baltimore for the past 24 years, where they have raised nine children ranging in age from four to 24 years.  Rabbi

Youlus and Rivka live modestly, and have worked hard to raise a loving, nurturing family. Rivka's

brother, Marc Lubin, attests:

> Menachem and my sister live a very modest lifestyle in a simple cape style home in
> Baltimore. Due to lack of space, a number of their children sleep in their basement.
> They did not own fancy cars nor did they go on extravagant vacations. In fact,
> nothing about their lifestyle was high end. Birthday parties for their children were
> made at home, with all the food being cooked and prepared at home.

Exhibit 71 at 1-2; *see also* Letter of Defendant's sister, Adinah Kutoff, Exhibit 72 at 1 ("Rabbi

Youlus is the prime example of 'charity begins at home.'").

Defendant's other sister, Tamar Englander, elaborates:

> He is a loving, caring and extremely responsible brother to me, son to my parents,
> husband and father to his family. He has seen to it that [when] we were drowning in
> debt, he helped us financially as well as giving my husband employment – which is
> the best kind of help. He is the shoulder upon which our aging father most relies –
> always there to handle emergency situations as well as day-to-day needs.

Exhibit 70 at 1. Moreover, observing her brother's role as husband and father, and his centrality to

his family, Tamar adds that "[h]is wife has relied upon his help and his caring heart to shoulder and

guide their family of nine children, who indeed rely daily on him practically as well as gaining from

his advice and guidance." *Id.*

In the same vein, Shifrah Garsek, Rabbi Youlus' niece, offers the perspective as a

member of the extended family. She writes poignantly of Rabbi Youlus' special relationship with

her brother, who has Down's Syndrome:

> When we visit Baltimore, Menachem takes my brother around with him[.] My
> brother *adores* Menachem and holds him in the highest esteem. He buys my brother,
> Shmuel, his favorite foods. Menachem knows what makes my brother happy and
> goes the extra mile to bring a smile to his face.

Exhibit 43 at 1. Of his uncle, Shmuel Kutoff adds: "[h]e's my fan. He's my really good friend."

Exhibit 73 at 1.

Indeed, the welfare of Rabbi Youlus' family is inextricably linked to his ability to

provide for them as a husband, father and son. Therefore, perhaps far more than is usually the case when a loved one is incarcerated, it is inevitable that *any* period of imprisonment imposed on Rabbi Youlus would be a *de facto* judgment upon members of his immediate and extended family as well. *See* Letter of J. Hefter, Exhibit 21 at 1 ("I know the pain he is going through now. The same he feels for his actions. The regret he has for what he did.  It is eating him up inside. As well as eating up his wife and children. The pain and suffering is written on their faces.").

       The fact is that, in many ways, Defendant's family stands to suffer the worst of all. Rabbi Youlus' potential absence would be a significant burden on Rivka, who, suffering from severe bouts of depression herself, would be left to raise their several younger children on her own. As Rabbi Hopfer, who counsels both Defendant and his wife, Rifka,  notes to the Court:

> Menachem and his wife Rivka have been blessed with nine children, eight of whom still live at home. Despite his many failings, Menachem has been a very dedicated, caring and loving father, actively involved in his children's lives. His active role in the day-to-day functioning of the family is critical. This was always true; it is especially true now, as the past year has taken a real toll on his wife Rivka who is literally and figuratively a shadow of her former self. She has suffered significant weight loss and is dealing with terrible anxiety. Should Menachem be absent from the home for any length of time, I truly shudder to consider the consequences for his wife and innocent children. It is more than regrettable that Menachem did not consider this before he committed those crimes; but alas it is a reality that I feel compelled to bring to the attention of the court.

Exhibit 78; *see also* Exhibit 79 (letter of Hadassah Zuravin, who has been providing counsel services to Rifka Youlus).

       Rabbi Youlus' absence will be made all the more acute because of Rivka's own experience growing up without a father. Rivka understands, first-hand, the tremendous challenge and burden of raising a family as a single parent, and the devastating loss to her children should they be separated from their father. As she explains:

> I grew up with the trauma and fear of having lost my own father to a prolonged and painful illness as a young child. I do not wish for my young and innocent children to

be inflicted or punished with this fear and trauma. They have suffered great fear during their father's many health crises and hospitalizations and need his love and attention for their own emotional stability.

Exhibit 74 at 2.

Rivka's lifelong friend, Vivienne Frank, describes Rivka's childhood without a father:

Rivka had to grow up very quickly [when] her father was diagnosed with leukemia and he passed away in 1978. When his illness became disabling, Rivka's mother went to work full time to support the family, leaving Rivka to run the house and parent her four brothers. Life was not easy for Rivka. While the rest of us were carefree teenagers whose biggest problem was how to unfrizz our hair or cover up our acnes, Rivka had to juggle school, housework, grocery shopping, cooking, and providing emotional support to her brothers.

Exhibit 75 at 2.

For her own sake as well, Rivka pleads with the Court to sentence her husband leniently. She adds: "I do not feel that I am emotionally or physically able to raise our young children on my own without Rabbi Youlus' physical presence. I am also unable to provide monetarily for our needs . . . ." Exhibit 74 at 2.

Defendant's elderly and infirm parents also greatly rely on their only son's care and attention. Joshua Youlus, who still suffers from memory loss as a result of the car accident many years ago, has in recent years been hospitalized for a series of debilitating strokes, including one episode which occurred around the time of Rabbi Youlus' arrest. Moreover, amidst the deteriorating health of her husband, Rabbi Youlus' mother has not only lost her hearing, but also suffers from a serious heart condition so that she must increasingly rely on Rabbi Youlus' assistance.

Vivienne Frank, Rivka Youlus' best friend, describes the dynamics of the extended family:

As members of the "sandwich generation," Menachem and Rivka Youlus juggle the needs of their youngest child, not quite four years old, their middle children, in the tumultuous adolescent years, their older children, who are young adults, their siblings, to whom they have always been "parent figures" and their elderly parents.

All these people need the teamwork that Menachem and Rivka together can provide, in order to survive and thrive.

Exhibit 75 at 2.

Defendant's mother, Eva Youlus adds:

The incarceration of Rabbi Youlus would cause the complete breakdown of the Youlus family -- financially and emotionally. This should not be allowed to happen. Rabbi Youlus' father is old, and he suffers from kidney disease. The loss of his son would almost certainly cause further deterioration of his health.

Exhibit 15 at 2.

Rabbi Youlus' sister, Adinah Kutoff, further explains:

My elderly parents . . . rely heavily on Rabbi Youlus to take care of both day to day and long term needs. With my sister already busy helping to take care for her mother in law who suffers from Alzheimer's, and my own family living so far away, it is Rabbi Youlus who helps our parents with finances, taxes, and decision making and with whatever leg work is needed. It is Rabbi Youlus who sees to their daily and long term needs. Rabbi Youlus takes our father to work, making sure he has something productive to do as well as ensuring that our father eats well and is physically safe.

Exhibit 72 at 1.

Avrom Landesman, Rabbi Youlus' uncle, advises that "[i]f Menachem were to be incarcerated, the effect on his wife, children, parents and sibling[s] would be devastating. In essence, he is the core of financial support for three families involved in the Jewish Bookstore of Washington." Exhibit 31 at 2. Rabbi Youlus' long-time friend, Naomi Benyowitz, offers her own personal insight on the issue of Defendant's awesome familial responsibilities:

I know his parents are suffering in every way that parents can suffer when a child is in jeopardy or ill. His wonderful wife and children are suffering and will likely never be able to throw off this nightmare. . . . It is not an easy road ahead for any of the Youlus family, but I believe this life can be salvaged and made right again. It's not too late for Rabbi Youlus to fix what is now wrong and I believe with the right professional help he will be willing and able to tackle these tough issues.

Exhibit 24 at 2.

Stuart Shabes, another dear friend who has been close to Defendant for close to 30 years, adds:

> Despite telling me over and over on numerous times how apologetic and terribly he feels, it is extremely noteworthy that he is the leader of the family and has an incredibly close bond and relationship with each of his 9 children. Each day, I see Menachem at the morning religious services with several of his younger children and the affection and care that he administers while at the same time receiving those feelings back in an exponential way cannot be replicated and his absence would cause enormous pain and suffering to those younger children especially those that are under the age of 12.
>
> His wife, Rivka, who I speak with and deal with on a regular basis is completely overwhelmed by the circumstances and severity of the situation. There is no question that she is fully and completely dependent on her husband who has taken the lead in so many vital ways in the running and caring for the home.

Exhibit 17 at 1-2.

Marshal Breger, a law professor at Catholic University, states:

> Seeing the effect on his wife and family has been harsh punishment for him already. He has learned the error of his ways and while there are many components of an appropriate criminal sentence, deterrence and the fear of recidivism are not, we believe, relevant to this specific case.

Exhibit 46 at 2.

Finally, we hope that the words of "victim," Gretchen Kugel, will strongly resonate with the Court:

> Rabbi Youlus has already lost much - respect, livelihood, and within the Orthodox world, the Youlus children are suffering in ways you may not imagine and that have far-reaching repercussions. I know the pain his mother felt a year ago when the charges were first brought and can only imagine how she is doing know. I have not seen any of the Youlus family since Rabbi Youlus pled guilty to the charges of mail fraud and fraud by wire, radio, or television. At first, I was simply too stunned and shocked. What would or could say? . . . . But this case has never been far from my mind and I have worked and reworked many drafts of this letter. It still is not perfect, but I hope you will consider my request for leniency in this case and thank you so much, Your Honor, for making the time to read it.

Exhibit 12 at 3.

## VI.     Guidelines Considerations

### A.     Adjusted Offense Level

Based on the agreement which serves as the basis for Defendant's plea, his total offense level is 24. Defendant's guideline range, therefore, prior to consideration of the proposed departure grounds, is 51-63 months.

### B.     Because Menachem Youlus is Extremely Frail and Suffers From a History of Coronary Artery Disease, Any Incarceration Could Have a Most Serious Adverse Impact Upon His Health

As demonstrated in the attached letter of Dr. Jerald Insel, Exhibit 76, it is clear that Rabbi Youlus is not a well man. Rather, he "has a history of coronary artery disease[]" and a "significant amount of cardiac symptoms." Exhibit 76 at 1.  He is also very frail, and, as counsel can personally attest (given Defendant's having suffered a cardiac event in counsel's office while participating in a highly stressful review of certain documents in this case), he can be incapacitated, if not placed in a life threatening situation, in any stressful moment.

As then District Judge Lynch determined,

> The Guidelines provide that "[p]hysical condition ... is not *ordinarily* relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.4 (emphasis added). However, as with other such "discouraged" grounds for departure, a departure is permitted for physical impairment where such a factor is present "to an exceptional degree." *Koon v. United States,* 518 U.S. 81, 95-96 (1996). Indeed, § 5H1.4 expressly recognizes that "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range."

United States v. Jimenez, 212 F.Supp.2d 214, 216 (S.D.N.Y. 2002) (finding that there was "no basis in law for the Government's contention" that "such a departure is only warranted where a defendant's physical ailments are of such a nature or degree that they cannot 'adequately . . . be cared for by the Bureau of Prisons.'").

Rather, ruled Judge Lynch,

> The example [in the guideline] instructs that departure would be warranted because "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4. This suggests a rather different, and penologically quite sound, rationale for departure. Where an extremely infirm defendant is so incapacitated that the ordinary purposes of incapacitation and deterrence of recidivism do not justify the expense of extended incarceration, some lesser degree of punishment is permissible, and indeed specifically authorized, by the Sentencing Commission.

*Id.*; *see also* <u>United States v. McFarlin</u>, 535 F.3d 808, 811 (8th Cir. 2008) (upholding a sentence of probation to a defendant with severe heart disease history, in the face of the Government's appeal, noting that "[t]he Guidelines also provide that, when considering a defendant's age, a court may consider alternative forms of incarceration for an elderly, infirm defendant that would be "equally efficient" as incarceration. § 5H1.1. Further, Section 3553(a)(2)(D) states that a court may consider the need for medical care when determining a sentence. 18 U.S.C. § 3553(a)(2)(D)"); <u>United States v. Gee</u>, 226 F.3d 885, 902 (7th Cir. 2000) (Upon noting that "[a]fter reviewing more than 500 pages of medical records, watching a videotaped deposition of Norris's cardiologist, observing Norris at trial and during sentencing, and listening to the in court testimony of both Norris and his mental health therapist, the district court concluded that imprisonment posed a substantial risk to Norris's life and, therefore, departure under U.S.S.G. § 5H1.4 was warranted." The Court ruled that "[i]n this case, moreover, the district court found that the BOP's letter was merely a form letter trumpeting the BOP's ability to handle medical conditions of all kinds. Consequently, it was not an abuse of discretion for the district court to conclude that Norris's medical condition warranted a downward departure." (fn. omitted)).

It is respectfully requested that Defendant's severe cardiac history warrants a downward departure. Surely, here as well, "'home detention may be as efficient as, and less costly than, imprisonment.' U.S.S.G. § 5H1.4." <u>Jimenez</u>, 212 F. Supp. 2d at 216.

**C.      Menachem Youlus' Continual Good Works and Consistent
            Acts of Communal Dedication Compel a Downward Departure**

Pursuant to the Sentencing Guidelines, acts of charity "and similar good works are

not ordinarily relevant in determining whether a sentence should be outside the applicable guideline

range." U.S.S.G. § 5H1.11. To be sure, the Second Circuit had observed that this is a "discouraged

basis for departure." United States v. Gaines, 295 F.3d 293, 303 (2d Cir. 2002). On the other hand,

in the later case of United States v. Canova, 412 F.3d 331 (2d Cir. 2005), the Court initially noted

its agreement with the Government's concession that while

> the guideline generally discourages departures on the stated grounds; it does not bar
> them absolutely. In such circumstances, even under a mandatory Guidelines system,
> a court was authorized to grant a downward departure "if the [discouraged] factor is
> present to an exceptional degree or in some other way makes the case different from
> the ordinary case where the factor is present." Koon v. United States, 518 U.S. 81,
> 96 (1996); *accord* United States v. Sprei, 145 F.3d 528, 534 (2d Cir.1998).

412 F.3d at 358.

Then, upon cataloging that defendant's commendable history of communal deeds and

military service, the Canova Court upheld the departure. *See also* United States v. Serafini, 233 F.3d

758, 773, 774 (3d Cir. 2000) (because "several constituents and friends described situations in which

Serafini extended himself to them in unique and meaningful ways during times of serious need. . .

," the district court's downward departure was not an abuse of discretion, since the facts depicted

the defendant "as an exceptionally giving person"); United States v. Woods, 159 F.3d 1132, 1136

(8th Cir. 1998) (upholding defendant's downward departure for charitable activities, which included

bringing two troubled young women into her home and paying for them to attend a private high

school, as well as helping to care for an elderly friend"); United States v. Cooper, 394 F.3d 172, 178

(3d Cir. 2005) (upholding departure upon stating that "[d]ownward departures for good works, however, are permissible when the works are exceptional").[5]

As described in the many letters discussed above, the charity and civic work engaged in by Rabbi Youlus is extensive in scope and indeed "exceptional," let alone extraordinary. <u>Canova</u>, *supra*. In such instances, other courts throughout the country have recognized the authority of a sentencing court to order a substantial downward departure from the Guideline sentence that would otherwise apply. *See, e.g.,* <u>United States v. Tomko</u>, 562 F.3d 558, 572 (3d Cir. 2009) (affirming departure to a sentence of probation from a recommended range of imprisonment of between twelve and eighteen months due largely to the defendants "exceptional" charitable acts and good works); <u>United States v. Thurston</u>, 544 F.3d 22, 26 (1st Cir. 2008) (affirming departure to a sentence of three months' incarceration and 24 months supervised release from a recommended guideline sentence of 60 months' imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others").

Whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the criteria delineated in 18 U.S.C. § 3553(a), a life of extraordinary works towards one's fellows remains a vital factor for a sentencing court to consider. *See, e.g.,* <u>Tomko</u>, 562 F.3d at 572 (noting that the defendant not only contributed money but also his personal time). Some courts have recognized that the "time" contributed by a defendant to a charitable organization is to be more highly rewarded than where the contributions of a defendant consist exclusively of the giving of money. *Id.*

---

[5] *But see* <u>United States v. Havey</u>, 227 Fed. Appx. 150,  2007 WL 1092914 (3d Cir. 2007) (holding that the district court's rejection of good works as a departure ground was within its discretion, and that <u>Cooper</u> did not alter that result).

In <u>Serafini</u>, the Third Circuit found that, because "[s]everal constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need," the district court's downward departure was not an abuse of discretion since the facts depicted the defendant "as an exceptionally giving person." <u>Serafini</u>, 233 F.3d at 773-774. The court noted that the defendant's acts "weren't acts of just giving money, they were acts of giving time, of giving one's self." *Id.* at 775. Notably, in <u>Serafini</u>, the Third Circuit highlighted the letters of just *three* individuals testifying to the defendant's charitable works: the first came from a friend who sought and received from the defendant a $300,000 guarantee to secure treatment for a family member's brain tumor; the second came from a constituent of the defendant (who was an elected official) who, having sustained serious injury in an accident that rendered him incapacitated, was hired by the defendant and who credits the defendant with "turning his life around"; the third letter came from a widow who approached the defendant because she was about to lose her home and to whom the defendant gave a check for $750 with no expectation of repayment. *Id.* at 774, 787.

Here, in contrast, we have an *extraordinary* situation manifested by almost 200 letters submitted in support of Menachem Youlus -- most demonstrating that he has engaged in scores of extremely impressive acts of charity. Perhaps more telling, they demonstrate ordinary and extraordinary acts of kindness and empathy on a daily basis, through which Rabbi Youlus has impacted upon the lives of countless people.

In this way, Rabbi Youlus is most like the defendant in <u>United States v. Adelson</u>, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006), for whom "[o]ver 100 persons from all walks of life submitted detailed letters attesting, from personal knowledge, to Adelson's good works and deep humanity." As Judge Rakoff therein stated:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should

be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Id.*

Rabbi Youlus' case is also akin to that of the defendant in <u>Tomko</u>, where "[s]everal dozen letters written on Tomko's behalf prior to his sentencing also demonstrate Tomko's community ties and extensive chairtable works." 562 F.3d at 572. *See also* <u>United States v. Jones</u>, 158 F.3d 492 (10th Cir. 1998) (affirming departure based in part on defendant's long history of community service and his strong support in the community, even among the family of the victim).

As demonstrated in so many of the letters written to Your Honor, Rabbi Youlus' acts of kindness, giving and charity far exceed the "ordinary." This defendant has simply devoted his life to the betterment of countless individuals. The many letters attest to his unceasing selfless acts in assisting others in their time of need, and of his constant giving of himself in ways that went far above what is normally expected of a relative, neighbor, friend or citizen. It is respectfully submitted that Rabbi Youlus should now be given credit for the generous and kind life that he has led, a life completely out of character with his offense conduct -- which, as the many letters and his own statement to the Court attest, is certainly not at all reflective of the man he has always been.

In sum, Rabbi Youlus brings to his day of sentencing a lifelong commitment to others in need. There are simply countless instances wherein he has provided personal time and tireless effort to individuals and non-profit organizations that offer services to myriad individuals and families. Counsel respectfully submits that, in this case, it is appropriate and important to consider the recognized departure for "extraordinary" charity, cited with approval by so many other courts.

As Judge Rakoff observed in *Adelson, supra*, a life of good work *must* count for something when standing before a sentencing court.

> **D.      Menachem Youlus' Extraordinary Family Circumstances**
> **Require a Downward Departure**

As regards familial responsibilities,  "[a] court still may depart on the basis of such a factor but only if it 'is present to a degree substantially in excess of that which ordinarily is involved in the offense.'" United States v. Huerta, 371 F.3d 88, 94 (2d Cir. 2004) (quoting Koon v. United States, 518 U.S. 81, 95 (1996) (quoting U.S.S.G. § 5K2.0)). In Huerta, 371 F.3d at 94-95, noting that "this factor -- the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents -- is a central part of the extraordinary family circumstances inquiry." *Id.* at 95. The Court of Appeals recalled certain cases where it had affirmed downward departures for family circumstances or family ties which presented extraordinary factors that weighed in favor. They include:

> United States v. Galante, 111 F.3d 1029, 1032, 1035 (2d Cir.1997) (affirming departure where defendant was sole provider for his wife (who had a "limited earning capacity" because of her difficulty speaking English) and their two children [ages 8 and 9]); United States v. Johnson, 964 F.2d 124, 129 (2d Cir.1992) (finding extraordinary family circumstances where the defendant was the sole caretaker for her three children and the young child of her institutionalized daughter); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir.1991) (affirming downward departure where the defendant and his wife were responsible for caring for their two daughters (ages 4 and 11), the defendant's disabled father (who depended on the defendant to help him in and out of his wheelchair and the defendant's grandmother).

Huerta, 371 F.3d at 94; see also United States v. Kon, 04 CR. 271-03, 2006 WL 3208555, at *5 (S.D.N.Y. Nov. 2, 2006) ("Due to the young age of Kon's daughter and the lack of any other adult to care for the child in the event of Kon's incarceration, this court finds that there are extraordinary family circumstances in this case sufficient to support either a downward departure pursuant to

U.S.S.G. §§ 5H1.6 and 5K2.0(a)(4)) or, alternatively, a non-Guidelines sentence in consideration

of 18 U.S.C. § 3553(a)(1).").

   Contrastingly, in other cases, which, <u>Huerta</u> noted, had "present[ed] less compelling

circumstances," the Court rejected family circumstances departures:

> <u>United States v. Smith</u>, 331 F.3d 292, 293-94 (2d Cir.2003) (holding that the
> defendant's family circumstances did not warrant a departure where defendant's wife,
> a part-time college student, earned about $1400 per month and his mother and
> half-sister lived only two blocks away from him and might be expected to assist with
> childcare for his two-year-old son); <u>United States v. Madrigal</u>, 331 F.3d 258, 260 (2d
> Cir.2003) (per curiam) (holding that family circumstances departure was
> inappropriate where only one of the defendant's six children was under the age of
> eighteen and there was evidence that the three older children (and perhaps members
> of the defendant's extended family) would be able to care for the younger siblings);
> <u>United States v. Faria</u>, 161 F.3d 761, 763 (2d Cir.1998) (per curiam) (holding that
> defendant's family was not "uniquely dependant" on him because his three children
> did not live with him and his ex-wife earned approximately $40,000 annually as a
> systems analyst).

<u>Huerta</u>, 371 F.3d at 95.

   It is respectfully submitted that, as demonstrated above, and unlike in these latter

instances, the familial obligations upon Rabbi Youlus are virtually insurmountable and any

incarceration on his part would place three generations of his family in extremely dire straights.

Indeed, the letters show that Defendant is the father of nine children, most of whom are young and

totally dependent upon him for financial, emotional and moral support. Crucially, as noted earlier,

his wife, Rifka, is herself in and out of severe depression which would only be dramatically

exacerbated were he to be removed from the household, given the sole parental responsibilities that

would thereupon devolve upon her during his absence, let alone the deprivation of financial support.

*See* Exhibits 79 and 80.

   In addition to the fact that Defendant essentially manages most divisions of the Jewish

Bookstore, *viz.*, the family business which is the entire source of income for both Defendant's

immediate family and his aging, infirm parents, there is the need on his part to look after and care for his parents in the first instance. All this, while Defendant, himself is certainly not in the best of either physical or emotional health. Indeed, ever since the reality of this criminal prosecution finally confronted him, he has also been undergoing rigorous therapy in order to deal with the psychological constraints, and the excessively hyperbolic rhetoric, that launched him into this most uncharacteristic and tragic mess in the first place. *See* Exhibit 1.

Most respectfully, all this is simply too much for one individual to bear, regardless of having now been convicted before this Court of a serious offense. It is therefore our fervent prayer that, on this basis alone, a significant downward departure will be ordered, thereby rendering Defendant eligible for a either a sentence of probation or home confinement.

E.    **The Extraordinary Restitution in This Case Further Warrants a Downward Departure**

As noted above, the plea agreement encumbers Defendant to forfeit to the Government an amount equal to $862,044.33. At the time of Defendant's plea, however, this Court directed the Government to determine how such monies could be allotted toward *restitution* to the victims rather than to be forfeited to the Government. The Government readily assented to the Court's determination that any true victims should be made whole.

In short, rather than regarding any monies to be paid as forfeiture, it is the Court's determination that such be viewed as restitution. As noted, counsel is now in possession, and has placed in escrow, the full amount of $862,044.33 provided in the plea agreement. Such monies will distributed as soon as we are directed to do so.

In <u>United States v. Broderson</u>, 67 F.3d 452 (2d Cir. 1995), the Court of Appeals upheld the district court's determination to depart downward based on that defendant's efforts at restitution. To be sure, the Court initially noted that "[o]rdinarily, payment of restitution is not an

appropriate basis for downward departure under Section 5K2.0 because it is adequately taken into account by Guidelines Section 3E1.1, dealing with acceptance of responsibility." Broderson, 67 F.3d at 458-59 (citing United States v. Arjoon, 964 F.2d 167, 171 (2d Cir.1992)). "Nor is lack of personal profit ordinarily a ground for departure, because the Commission generally took that factor into account in drafting the Guidelines." Broderson, 67 F.3d at 459 (quoting United States v. Seacott, 15 F.3d 1380, 1387 (7th Cir.1994)). The Court determined, however, that "[n]evertheless, we also recognize the district court's "better 'feel' for the unique circumstances of the particular case before it," and "special competence" in determining whether that case falls within the "heartland." Broderson, 67 F.3d at 459 (quoting United States v. Rivera, 994 F.2d 942, 951 (1st Cir. 1993)). Accordingly, Broderson "conclude[d] that the district court could permissibly depart in the present case." Broderson, 67 F.3d at 459.

Other Circuits have similarly ruled. See United States v. Crook, 9 F.3d 1422, 1426 (9th Cir. 1993) ("[w]e recently held in United States v. Miller, 991 F.2d 552 (9th Cir.1993), that extraordinary restitution is a basis for downward departure only "to the extent it shows acceptance of responsibility." Id. at 553. Unlike extraordinary restitution, civil forfeiture is not a voluntary act which demonstrates acceptance of responsibility. Restitution is not, therefore, a viable analogy."); United States v. Condelee, 961 F.2d 1351, 1353 (8th Cir. 1992) ("we have recognized the authority of sentencing judges to depart downward from the guidelines without any government motion, in unusual circumstances such as extraordinary restitution"); United States v. Hairston, 96 F.3d 102, 108 (4th Cir. 1996) ("restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual.'"); United States v. Kim, 364

F.3d 1235, 1240 (11th Cir. 2004) ("We now join the Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits and hold that extraordinary restitution is not a prohibited factor.").[6]

Based on all the foregoing, it is respectfully submitted that Defendant, through his wholly supportive family, and at great personal sacrifice, has amassed the full sum toward restitution in this case. It is prayed that Defendant can benefit thereby in the form of a consequent downward departure.

VII.  **After Considering the Guidelines, The Court Should Impose a Lesser, Non-Guidelines Sentence Based on the Criteria Delineated in 18 U.S.C. §§ 3553(a) and 3661**

We respectfully submit that, were the Court, after considering the Guidelines, to decline granting the requested downward departures, it should nevertheless impose, in its discretion, a lesser, non-guidelines sentence for the same reasons earlier stated, and for those additional reasons that follow. We thus pray that the Court imposes a term of probation with the suggested condition of community service. Under such constraints, Menachem Youlus could be well expected to devote

---

[6] Notably, in <u>Kim</u>, 364 F.3d at 1240 n.6., the Eleventh Circuit observed the following:

The Government suggests that the federal circuits are split when it contends that the Second, Fifth, and Sixth Circuits have held restitution to be a prohibited factor. *See, e.g.,* <u>United States v. Carpenter</u>, 320 F.3d 334, 343 (2d Cir. 2003); <u>United States v. Akin</u>, 62 F.3d 700, 702 (5th Cir. 1995); <u>United States v. DeMonte</u>, 25 F.3d 343, 346 (6th Cir. 1994); <u>United States v. Flowers</u>, 55 F.3d 218, 222 (6th Cir. 1995). We doubt there is a circuit split because none of these cases hold extraordinary restitution to be a forbidden factor. Admittedly, in *Carpenter* the Second Circuit explained that because "*restitution before conviction cannot justify a downward departure,* we do not think that compliance with court-ordered restitution after conviction and sentencing can." <u>Carpenter</u>, 320 F.3d at 343 (emphasis added). However, the Second Circuit had previously stated that restitution is a discouraged factor. <u>United States v. Broderson</u>, 67 F.3d 452, 458-59 (2d Cir. 1995). Under Second Circuit law, because <u>Broderson</u> was decided by a prior panel, and *Carpenter* was not an en banc decision, <u>Broderson</u> is the controlling precedent. *See* <u>Shattuck v. Hoegl</u>, 523 F.2d 509, 514 n. 8 (2d Cir. 1975) (explaining that subsequent panel decisions, "not being an en banc decision, may not be viewed as having overruled our earlier [panel decision]").

a significant amount of time each week on behalf of those who might benefit from his talents, his energy and his consummate humanity. At the worst, we respectfully request that any custodial sentence be measured in months rather than years.

Although, to be sure, as the Supreme court has recognized, "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," Gall v. United States, 552 U.S. 38, 48 (2007), that is not to say that a term of probation amounts to a free ride. Rather,

> [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See United States v. Knights, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting Griffin v. Wisconsin, 483 U.S. 868, 874 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

552 U.S. at 48-49 (fn. omitted).

In reality, weighing all those factors delineated in 18 U.S.C. § 3553(a)(2), which, in this post United States v. Booker, 543 U.S. 220 (2005) regime, "acquire[] renewed significance," United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005), we respectfully submit that incarcerating this highly regarded rabbi for *any* period of time would be inimical to the ends of justice. The fact is, because "the punishment should fit the offender and not merely the crime," Pepper v. United States, 131 S.Ct. 1229, 1240 (2011) (quoting Williams v. New York, 337 U.S. 241, 247 (1949) (internal quotes omitted)), given the unique circumstances attending this particular defendant, we believe that the Court should grant a variance from what the guidelines otherwise prescribe.

Indeed,

> post-<u>Booker</u> opinions make clear that, although a sentencing court must "give respectful consideration to the Guidelines, <u>Booker</u> permits the court to tailor the sentence in light of other statutory concerns as well." <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (internal quotation marks and citation omitted). Accordingly, although the "Guidelines should be the starting point and the initial benchmark," district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), subject to appellate review for "reasonableness." <u>Gall</u>, 552 U.S., at 49-51, 128 S.Ct. 586.

<u>Pepper</u>, 131 S.Ct. at 1241.

Unlike in the prior, mandatory regime, "[t]he statute, as modified by <u>Booker,</u> contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.' 18 U.S.C. § 3553(a) (2000 ed. and Supp. V)." <u>Kimbrough</u>, 552 U.S. at 101; *see also* 18 U.S.C. § 3661.

Respectfully, in the final analysis, as reflected in the highly laudatory letters accompanying this memorandum, the sort of man which Menachem Youlus has always been, and continues to be, extricated from the otherwise inexplicable conduct which underlies the offense of which he has been convicted, should be the Court's ultimate focus of attention. For, as <u>Pepper</u> reminds us, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 131 S.Ct. at 1239-40 (quoting <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996) (internal quotes omitted)).

As shown, the acts involved in this case, on balance, appears to represent an aberrational pattern of conduct within an otherwise law-abiding and truly exemplary history. Thus, while apparently not satisfying the threshold for a downward departure pursuant to USSG § 5K2.20, *see* United States v. Castellanos, 355 F.3d 56 (2d Cir. 2003), the conduct in this case was certainly not indicative of, but, rather, was contrary to, the exemplary life which Menachem Youlus has otherwise led. *Cf.* United States v. Lucania, 379 F.Supp.2d 288, 298 (E.D.N.Y. 2005) (stating that "Section 3553(a)(2)(C) also requires the Court to specifically consider the need for specific deterrence, that is to deter these particular defendants from committing similar offenses in the future. Post-*Booker* courts have noted that recidivism is markedly lower for older defendants. *E.g.* United States v. Eberhard, 03 CR. 562, 2005 WL 1384038 (S.D.N.Y. June 9, 2005); United States v. Coleman, 370 F.Supp.2d 661, 681 (S.D. Ohio 2005); Simon v. United States, 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005); United States v. Hernandez, 03 CR. 1257, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005); United States v. Carmona-Rodriguez, 04 CR 667, 2005 WL 840464, at *5 (S.D.N.Y. Apr.11, 2005); United States v. Nellum, 2:04-CR-30, 2005 WL 300073, at *3 (N.D. Ind. Feb.3, 2005)."), *affirmed in part, vacated in part and remanded, sub nom.*, United States v. Cavera, 505 F.3d 216 (2d Cir. 2007), *opinion vacated on rehearing en Banc and affirmed,* 550 F.3d 180 (2d Cir 2008); *see also* United States v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993) ("the length of time a person refrains from the commission of crimes, which is invariably tied to a person's age, is a factor that is critical to a court's determination of the sentence it should impose.").

Incontestably, the nature of these offenses and the character of the offender certainly suggest that any chance of recidivism, owing to the aberrant nature of the Defendant's conduct, is non-existent. *See* United States v. Carmona-Rodriguez, 04 CR 667, 2005 WL 840464, at *4-5 (S.D.N.Y. April 11, 2005) (applying non-guideline sentence to post-Booker sentencing, district court

noted that "[t]wo recent courts have declined to impose Guidelines sentences on defendants who, like Carmona-Rodriguez, were over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants." (citing <u>Simon v. United States</u>, 361 F.Supp.2d 35 (E.D.N.Y. 2005) (imposing a term of incarceration of 240 months on a 43-year-old defendant where the Guidelines recommended a minimum of 324 months) & <u>United States v. Nellum</u>, 04-CR-30, 2005 WL 300073, at *3 (N.D. Ind. Feb.3, 2005) (imposing a term of incarceration of 108 months on a 57- year-old defendant where the Guidelines recommended a minimum of 168 months))).

This is not an insignificant consideration. For, as <u>Pepper</u> just recently recalled, "the likelihood that [a convicted defendant] will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." <u>Pepper</u>, 131 S.Ct. at 1242 (citing 18 U.S.C. §§ 3553(a)(2)(B)-(C) & <u>Gall</u>, 552 U.S. at 59).

Tragically, as elaborated upon above, owing to his uncharacteristic conduct in this case, Defendant has truly lost far more than physical assets, but rather a commodity that has always been much more invaluable. He has compromised his position in his community. Thus, most tragically, an otherwise impeccable reputation which had been a source of infinite pride and communal standing, let alone a great sense of self-worth, has been extraordinarily tarnished, even if not irretrievably eviscerated.

There remains no doubt, therefore, notwithstanding the 200 glowing letters accompanying this memorandum, that Menachem Youlus has immeasurably compromised the respect, admiration and esteem of many of his friends, neighbors and acquaintances. Given the sort of man whom Menachem Youlus has always been, the degree of shame attending these consequences is truly beyond estimation.

Most respectfully, after he has lost so much, and given the man he has always been and certainly continues to be, it is respectfully submitted that a sentence of imprisonment is unnecessary. *Cf.* United States v. Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993) (Broderick, J.) (destruction of business and hence, elimination of source of income and ability to engage in similar activities, were already a source of individual and general deterrence), *aff'd* 31 F.3d 73 (2d Cir. 1994); United States v. Speed Joyeros, S.A., 204 F.Supp.2d 412, 440 (E.D.N.Y. 2002) (Weinstein, J.) (same).

Indeed, for the Court now to order Menachem Youlus to be imprisoned under these circumstances would only amount to the last -- and certainly the most onerous -- of the many burdens which he has now come to bear. Thus, because, as cannot be too often reiterated, Congress has mandated that a sentencing court "shall impose a sentence sufficient, but *not* greater than necessary," to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner, 18 U.S.C. § 3553(a), we respectfully submit that a balancing of the equities in this case ineluctably favors probation.

This position is only buttressed by a sentencing court's newly invigorated discretion to consider information concerning a defendant's background, character and conduct for the purpose of imposing an appropriate sentence. *See* Pepper, 131 S.Ct. at 1240 (noting that "[t]he Sentencing Commission . . . expressly incorporated § 3661 in the Guidelines: 'In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, *without limitation,* any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. §3661.'" (quoting U.S.S.G. § 1B1.4 (2010)).

In sum, weighing the circumstances surrounding Menachem Youlus' offenses against 1) a lifetime of devoting his time, talents and energy toward the betterment of the community; 2) his impeccable personal background; 3) the fact that he still has much to contribute to society, as noted even by victims in this case; and 4) the exceedingly dire straights which any period of probation would place his wife, children and elderly parents, we respectfully submit that leniency at sentencing is surely warranted. We ask, therefore, that Rabbi Menachem Youlus be afforded the opportunity to continue contributing toward the betterment of his fellow citizens by the imposition of a sentence of probation, or, in the discretion of this Court, a sentence that reflects great leniency and compassion.

## <u>CONCLUSION</u>

**For All the Foregoing Reasons, it is Respectfully Submitted that Menachem Youlous Should Be Sentenced to a Term of Probation With the Suggested Condition of Community Service, or, at Most, a Sentence that Reflects Great Leniency and Compassion**

Dated: New York, New York
September 28, 2012

Respectfully submitted,

**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Defendant*
*Menachem Youlus*
767 Third Avenue, 26th Floor
New York, New York 10017

By: _____
BENJAMIN BRAFMAN
BB2285

_____
MARK M. BAKER
MB5365

JACOB KAPLAN
Of Counsel

Jennifer Li
Legal Assistant
Assisting on the Memorandum