CABBYOU1                    Sentencing

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                              12 Cr. 36 (CM)

MENACHEM YOULUS,

            Defendant.

------------------------------x

                               New York, N.Y.
                               October 11, 2012
                               4:16 p.m.

Before:

                 HON. COLLEEN MCMAHON,

                               District Judge

                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
NICOLE FRIEDLANDER
JANIS ECHENBERG
    Assistant United States Attorneys

BRAFMAN & ASSOCIATES, P.C.
    Attorneys for Defendant
BENJAMIN BRAFMAN
MARK M. BAKER

ALSO PRESENT:
    GREG GHIOZZI, United States Postal Inspector

CABBYOU1                    Sentencing

1          (In open court)

2          THE DEPUTY CLERK:  Honorable Colleen McMahon

3    presiding.  This is 12 Cr. 36, *United States of America v.*

4    *Menachem Youlus.*

5          Your appearance, please.

6          MS. FRIEDLANDER:  Good afternoon, your Honor.  Nicole

7    Friedlander and Janis Echenberg for the government.  With us

8    today is Postal Inspector Greg Ghiozzi.

9          MS. ECHENBERG:  Good afternoon.

10          THE COURT:  Good afternoon.

11          MR. BRAFMAN:  Good afternoon, your Honor.  Benjamin

12    Brafman and Mark Baker and my associate, Jacob Kaplan, for

13    Mr. Youlus, who is present and ready for sentencing.  Good

14    afternoon, your Honor.

15          THE COURT:  Good afternoon.  Everybody have a seat.

16    This matter is on for sentencing under Docket No. 12 Criminal

17    36 01, *United States of America v. Menachem Youlus.*

18          Mr. Youlus, having been found guilty by plea to one

19    count of mail fraud and one count of wire fraud, each of them

20    Class C felonies, in violation of 18 United States Code,

21    Sections 1341 and 1343, respectively.  Each count carries a

22    statutory maximum sentence of 20 years' imprisonment, three

23    years of supervised release, a $250,000 fine or twice the gross

24    gain to the defendant or loss to identifiable victims other

25    than the defendant, and a $100 special assessment.

CABBYOU1                    Sentencing

1          In connection with today's proceedings, I have

2    received and reviewed the presentence report prepared by United

3    States Probation Officer Walter J. Flynn.  I have an

4    extraordinary number of other documents, all of which have

5    been called to my attention, all of which I will put on the

6    record.

7          I have sentencing memoranda from the government and

8    from Mr. Brafman, as well as an additional letter from

9    Mr. Brafman that is dated September 28, 2012, and addressed to

10   me.

11          I have a pile of victim impact letters that have been

12   submitted by Wendy Olsen Clancy, the victim witness

13   coordinator, with the United States Attorney's Office.  Some of

14   them are from lawyers; some of them are from individuals who

15   were defrauded.  This is that pile.

16          I have from Mr. Brafman two extensive binders

17   containing, I believe, a total of, Binder A, 79 letters; Binder

18   B, additional letters, not separately numbered, but as you can

19   see, it is an inch thick.  In addition, I have several other--

20   okay.  Those are from Mr. Brafman.

21          Then I have things that are filed-- I have what is

22   called Exhibit A.  I'm not sure what this is Exhibit A to and

23   Exhibit B to.

24          Are these from the government's sentencing memorandum?

25          MS. FRIEDLANDER:  Yes, your Honor.  They're exhibits

CABBYOU1                    Sentencing

1      to our sentencing memorandum.

2              THE COURT:  Exhibits from the government's sentencing

3      memorandum.  Then there are Exhibits C, E, F, G and H to the

4      government's sentencing memorandum which have been filed under

5      seal.

6              Is there an Exhibit D to the government's sentencing

7      memorandum?  Because I can't find it.

8              MS. FRIEDLANDER:  Yes.  D should have been with A and

9      B.  Those were all-- A, B and D were the exhibits that we

10     filed.

11             THE COURT:  Jimmy, is there a D in that pile

12     somewhere?  Because I couldn't find D.

13             Okay.  Then I have a consent order of forfeiture.  I

14     have an order of restitution, which is not something that I'm

15     accustomed to seeing since I have pronounced restitution

16     orally.

17             THE DEPUTY CLERK:  Here's Exhibit D.  Oh, Exhibit D.

18     Let me look at Exhibit D.  Okay.

19             Those are the government's sentencing memorandum

20     exhibits.

21             Then I have two letters dated October 10:  One from

22     the United States Attorney, which submits the proposed

23     restitution order, and one from Mr. Brafman that addresses the

24     proposed restitution order.  That's what I've got piled up here

25     on the bench.

CABBYOU1                    Sentencing

1              Is there anything else I should have seen in writing

2        prior to today's proceedings from the government?

3              MS. FRIEDLANDER:  No, your Honor.

4              THE COURT:  From the defendant?

5              MR. BRAFMAN:  I don't believe so, your Honor, but may

6        I just ask for clarification?  Your Honor held up a pile of

7        letters that your Honor classified as victim impact letters

8        that were provided by the government, including letters from

9        people who were defrauded.  Among the impact letters that we

10       received from the government, which we quote in our memo

11       extensively, are people who are classified as victim impact

12       letters--

13             THE COURT:  "I don't feel victimized in the same way

14       as other victims."  I've got every -- this is just a pile of

15       letters I've gotten from the government.

16             MR. BRAFMAN:  That's fine, your Honor.

17             THE COURT:  All right?

18             MR. BRAFMAN:  Yes.  You have them all.

19             THE COURT:  I have people on both sides of the aisles

20       here.  I have victims who say I don't feel victimized, but I

21       have victims who want to kill the defendant.  I've got

22       everybody-- and everybody in between, every shade of person in

23       between.

24             MR. BRAFMAN:  Thank you very much, Judge.

25             THE COURT:  Okay.  Has the government reviewed the

CABBYOU1                          Sentencing

1    presence report?

2              MS. FRIEDLANDER:  Yes, your Honor, we have.

3              THE COURT:  Additions, deletions or corrections?

4              MS. FRIEDLANDER:  No, we don't.  We don't have any

5    changes.

6              THE COURT:  Ms. Friedlander, do you wish to be heard

7    on sentencing?

8              MS. FRIEDLANDER:  Yes, your Honor, I do.

9              THE COURT:  I thought you might.

10             MS. FRIEDLANDER:  Your Honor, the defense has given

11   you a submission that talks at length about the defendant's

12   many good deeds in the community and the pain that his family

13   will feel if he goes to jail.  I expect that we're going to

14   hear some more about that today.

15             I just want to be clear, we don't have any doubt about

16   either of those things and we do think the Court should take

17   those into account.  But we want to be clear that there are

18   many other factors not addressed in their sentencing

19   submission that weigh in favor of a guidelines sentence in this

20   case.

21             In terms of the emotional impact of this crime,

22   Mr. Youlus has committed one of the most devastating frauds in

23   recent memory.  He exploited people's need to remember loved

24   ones who suffered or died in the Holocaust.  He manipulated his

25   own community's need to bear witness to a catastrophe among

CABBYOU1                    Sentencing

1    their people, and he did it all to enrich himself day in and

2    day out for years.

3            On top of that, as the Court knows, this is not a case

4    where the defendant was motivated by financial hardship or

5    desperation.  Mr. Youlus had every advantage:  Education,

6    citizenship, family support, secure employment, and financial

7    stability.  Things that many people can only dream about.  He

8    was motivated by pure greed to get money from innocent people

9    at the expense of their most sacred memories and beliefs.

10           The Court has received a number of powerful letters

11   from victims and there are some victims who would like to be

12   heard briefly today.  There's one person who's written to the

13   Court who I don't believe intends to speak today whose presence

14   in the courtroom I'd just like to draw the Court's attention

15   to.  His name is Menachem Rosensaft.

16           Mr. Rosensaft's parents survived the concentration

17   camps at Auschwitz and Bergen-Belsen.  He himself was born in

18   the Displaced Persons camp at Bergen-Belsen.  Mr. Rosensaft is

19   currently the vice president of the American Gathering of

20   Jewish Holocaust Survivors and Their Descendants, which is the

21   umbrella organization of Holocaust survivors and Their

22   Descendants in the United States.  He's also the general

23   counsel of the World Jewish Congress, and he is a lecturer at

24   Columbia Law School and Cornell Law School, among other

25   places.

CABBYOU1                         Sentencing

1              I'd just like to read briefly from his letter, which I

2      think captures the significance of this crime to many members

3      of the Jewish community who are not direct financial victims of

4      this fraud.

5              He wrote:  "The millions murdered by the Third Reich

6      deserve a rigorously factual and scrupulously honest

7      remembrance."

8                      (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cab1you2

1            MS. FRIEDLANDER:  "So do the hundreds and thousands of

2       Torah scrolls and other sacred Jewish writings and religious

3       artifacts that were decimated in the Holocaust together it with

4       thousands upon thousands of Jewish communities, Jewish homes,

5       synagogues and Hasidic prayer rooms across Nazi-occupied

6       Europe.  Mr. Youlus is not the first to distort and falsify

7       Holocaust memory, but he is without question one of the most

8       reprehensible.  Others have lied about their past to aggrandize

9       themselves or further an antiSemitic ideology.  Mr. Youlus's

10      motivation was pure greed.  He exploited the memory of the dead

11      to enrich himself illicitly."

12            Your Honor, would I have an opportunity to respond

13      after Mr. Brafman speaks?

14            THE COURT:  The government always has an opportunity

15      to respond.

16            MS. FRIEDLANDER:  Okay.  Well, with that then, your

17      Honor, I'll rest on our submission.  For the reasons that we

18      discussed in our sentencing memorandum, we ask that you

19      sentence the defendant to a guidelines sentence of 51 to 63

20      months.

21            THE COURT:  It seems to me that it's appropriate now

22      that we hear, since it's really part of the government's

23      presentation, from any of the individuals who wish to speak

24      today.  I've been advised that there are three individuals who

25      wish to speak.

Cab1you2

1          Good afternoon, ma'am.

2          MS. EPSTEIN MAKAR:   Good afternoon, your Honor.   My

3    name is Chaplain Mollie Epstein Makar, and I appreciate the

4    court's indulgence for me to spend a couple of minutes just to

5    give you my story of how this fraud affected us.

6          The basis of Jewish law and tradition is the Torah,

7    and the Torah contains narrative statements of law and

8    statements of ethics.  Collectively, these laws, usually called

9    Biblical Law or Commandment, are sometimes referred to as the

10   Law of Moses or the Jewish Written Law.  The Torah consists of

11   five books of the Hebrew Bible, known more commonly as the Old

12   Testament, and we believe that they were given by God to Moses

13   on Mount Sinai and include within them all of the Biblical Laws

14   of Judaism.  The Torah is also known as the Pentateuch, or the

15   Five Books of Moses.

16         And now the word mitzvah.  A mitzvah is a commandment,

17   one of the 613 relating to Jewish observance and religious

18   practice.  The commandments are the centerpiece of Judaism

19   because they are where the faithfulness to God and his Torah

20   translate into action.

21         Every sphere of human activity falls under the Torah's

22   authority.  From rising in the morning to retiring at night,

23   from birth until death, the commandments encompass every area

24   of Jewish life.  This idea sets the scene for understanding how

25   the Torah commandments come to define and explain what living

Cab1you2

1    means for a Jew -- namely, the continual opportunities to

2    connect to God.

3            And I would like to turn our attention to one of these

4    613 commandments found in the Torah, and this is the positive

5    commandment for each and every Jewish man to write a Torah

6    scroll for himself.  The source for this is found in the book

7    of Deuteronomy, chapter 31, verse 19, where it states, and I

8    quote, "And now write down this song for yourself."  The

9    implication is that each person writes an entire Torah which

10   contains the song referred to in that verse.  In rabbinic

11   literature, the highest ideal of all Jewish men is Torah study.

12   Engaging in the study of Torah is considered equal to a number

13   of the other mitzvahs -- as we call them, mitzvots -- such as

14   visiting the sick, honoring one's parents, and bringing peace

15   between people.

16           The reason I explain Torah and mitzvah is to enable

17   the court to understand the level of importance and

18   significance they hold in Jewish practice.

19           Now as I mentioned, a mitzvah is incumbent upon every

20   Jew to write or facilitate in the writing of a Torah.  Writing

21   a Torah is not possible for the lay individual.  It requires

22   extensive training and takes a professional over a year to

23   finish one scroll.  For that reason, many people contribute

24   funds to enable a Torah to be scribed.  And I have an example

25   here of a certificate from 1999 when my synagogue commissioned

Cab1you2

1    the scribing of a new Torah.  Members of the congregation and

2    of the community at large contributed various sums of money

3    that together paid for the Torah.  The completion of a scroll

4    is a cause for tremendous celebration.  The completed Torah is

5    paraded into the synagogue with great jubilation and fanfare,

6    equivalent to the arriving of a bride for her wedding.  Usually

7    the procession carries on for blocks and for streets, with

8    everyone celebrating the commission of this new Torah and

9    bringing it and its holiness into our midst.  You can see from

10   this that my family contributed a sum of money to enable our

11   congregation to finance that new Torah.  And we dedicated our

12   donation in honor of our parents' wedding anniversary and chose

13   a verse from the Torah that speaks to the relationship between

14   parents and children.  In this way we all became partners in

15   the mitzvah of writing this new Torah.

16          At the time of my father's 75th birthday, February

17   2008, we were looking to do something meaningful in his Honor,

18   and my father comes from a long line of deeply religious,

19   committed Jews.  His father was a cantor, his father's brothers

20   were cantors.  A cantor is a member of the clergy who leads the

21   liturgical portion of a prayer service, performs weddings,

22   funerals, and the like.  So we searched for some way to

23   appropriately honor this milestone.

24          My sister found the Save a Torah website.  I called

25   the office in Baltimore and spoke with Ellen Elow-Mintz, who

Cab1you2

was the executive director at the time, and she explained the
wonderful works that Save a Torah was doing, and she told me
that she would send me a DVD showing actual rescues,
refurbishings, and placing of Torahs around the world.  I
really thought that this would be a more than wonderful way to
honor my father's 75th birthday.  What better way than
contributing to the continuance of Torah Judaism through an
organization that is actually hands on, taking damaged Torahs
from the depths of despair, those rescued from places
devastated during the Holocaust and other locations, and giving
them new life in new communities.  I was told that the Torahs
were placed in communities that prior to that didn't have a
Torah.  How privileged, we felt, to be a part of the work to
bring living Judaism into communities thirsting for the
opportunity to pray and to live as the Torah directs them.
This was also a beautiful way to fulfill the mitzvah of passing
on Judaism from one generation to the next, that we call in
Hebrew *l'dor vador*.

         So I collected money from the family, my sister, my
children, and sent a donation in to Save a Torah.  Ellen sent
me a beautiful letter to present to my father.  I have a copy
of that here, if you're interested to see it, your Honor.

         And we framed the letter and we presented it to dad.
He read the letter out loud and the tears began to form in his
eyes.  By the time he finished reading the letter, the tears

Cab1you2

1    were streaming down his face.  He was so overcome with emotion,

2    he had difficulty speaking.  When dad was able to speak, he

3    expressed his deep appreciation for performing this wonderful

4    mitzvah in his name.  He reminisced about his childhood and his

5    synagogue and the prominence of the Torah, the life lessons he

6    learned from the study of Torah.  He elaborated about the

7    importance of this work and how elated he was that these Torahs

8    are being lovingly cared for and being placed for continued

9    use.  He placed the framed letter prominently on the mantel in

10   the front room of his home, and that is where it stayed, till

11   now.

12        Later that evening we all watched the DVD that Ellen

13   had sent.  It was so well done and so convincing that we all

14   had tears in our eyes.

15        From that time dad would occasionally refer to the

16   letter or show it to a visitor to the house and speak about the

17   wonderful work being done in restoring Torahs by Save a Torah.

18   That birthday gift was truly the best one we had ever given

19   him, or so we thought.

20        Then I began receiving notices from the US Department

21   of Justice Victims Notification System.  I hadn't heard

22   anything about this on the news and so these letters were a

23   complete shock.  I called the number, the phone number on the

24   letter and spoke to Wendy Olsen Clancy, the victim witness

25   coordinator, who explained the case to me, and I really

Cab1you2

appreciated her ability to make it understandable and the

respect she showed for the Torah and for Judaism in the way she

spoke.

I was truly shaken after my conversation with Wendy.

There were so many thoughts and emotions running through me,

but the most devastating was, what do I do now?  Do I keep this

information to myself or do I tell my family?  Especially, do I

tell my father?  This information tormented me for months.  My

sister and I realized that we were both receiving these

letters, and finally the letter came notifying us about this

court date today.  This gave me the impetus to act.  I decided

to tell my children.  They were horrified, on many levels.  The

idea that someone would use the Torah, the essence of our law

and our lives, as a vehicle to commit a crime was beyond

them -- beyond all of us, really.  And it was embarrassing to

us as a people to find that a member of our clergy, someone we

entrust to teach us the Torah way of life, would use the Torah

and the horrors of the Holocaust to prey -- that's P-R-E-Y --

on fellow Jews and festivities and cause them harm.  And we

felt embarrassed and angry at having fallen victim to a scam.

We then decided to tell our father, and it was one of

the most difficult things we had to do.  The family was

together, and we told him what we learned from the letters and

the phone calls.  The height of his elation that he showed at

receiving the letter for his birthday paled in comparison to

Cab1you2

1    the depths of sadness and upset he showed at receiving this

2    news.  He said the same thing we all said:  How can this be?

3    How can this happen?  But in my father's own way, to try to

4    lessen the burden on his children, as we all do with our

5    children, he tried to make us feel better by telling us that

6    our intentions were honorable, that we readily contributed to

7    what we thought was a mitzvah in the making.  The stain is not

8    on us.  It still didn't erase the mortifying feeling and the

9    feeling of loss and victimization.

10          And your Honor, I spoke with my Rabbi about the

11    appropriateness of speaking here today, because it's not

12    comfortable to do this, for a fellow human being, for a fellow

13    Jew.  But I know I was conflicted.  And he told me that

14    although it is not for us to contribute to someone's

15    misfortune, it is incumbent upon us to bear witness to an

16    observed wrongdoing.  And he said it would be important for me

17    to tell our story, our family's story.  So with a heavy heart,

18    I stand before you today.

19          Thank you very much.

20          THE COURT:  Thank you.

21          MS. EPSTEIN:  Hello.

22          THE COURT:  Hello.

23          MS. EPSTEIN:  I'm Rachel Epstein, and I'll just

24    take -- I'll be very brief because my sister was so eloquent

25    and so authentic in everything that she has already recounted

Cab1you2

1    on behalf of our family.

2            I just think it needs to be said that -- how this has

3    got to be probably one of the saddest times to actually have to

4    address this court, and with our own people.  This is our own

5    people.  And with our history and what has happened to our

6    people, to think that this is something that one is doing to

7    another.

8            When I found Save a Torah, it was like our go-to

9    thing, and interestingly enough, you could see through my

10   checks, is there were several one right after another, saying

11   we found a fabulous, wonderful way to honor people that are

12   close to us, and so it became our thing.  And to see something

13   like this is just absolutely overwhelming.  But to the point

14   also where we have contributed several times on behalf of

15   clergy, Christian clergy who are scholars who I deal with in my

16   business life, who were so honored by this kind of thing, and

17   the embarrassment in how you even begin to explain.  Unlike

18   Dad, who knew where I stand, I didn't even have the heart to

19   say to Christian clergy that, "Never mind what we told you.

20   That was really all of nothing."

21           So it does go a little bit beyond even our own

22   community, and I just wanted to impart those words.  And thank

23   you very much.

24           THE COURT:  Thank you.

25           MR. KUSHNER:  Good afternoon, your Honor.

Cab1you2

1          THE COURT:  Good afternoon, sir.

2          MR. KUSHNER:  Thank you.  My name is Robert Kushner.

3          THE COURT:  Good.  Thank you.

4          MR. KUSHNER:  And it was in memory of my father that

5   the Torah was acquired from Menachem Youlus from supposedly a

6   grave in Kamyanets-Podilsky, which is the community in which my

7   father grew up, was born, and in which his siblings lived.

8   Because of the love for my father and the love of other members

9   of the family for my father, I decided that the best way to

10  honor him would be to dedicate a Torah that came from

11  Kamyanets-Podilsky in his memory and contribute it to our

12  synagogue.

13          As was explained a little while ago, when a new Torah

14  is brought into a synagogue, it's treated as the wedding.  The

15  Torah is carried under a canopy, and in this particular case,

16  the Torah was carried by my 11-year-old grandson, who bears my

17  father's English and Hebrew names.

18          In my opinion, this is not a garden variety type of

19  fraud.  It's not the kind of situation where somebody has been

20  deprived of money.  Here, memories or honors are really being

21  trod upon.  And there is tremendous disappointment and sadness

22  when that happens.  We -- when the Torah was acquired, it was

23  with great jubilation that my wife and I -- at that point we'd

24  been married for almost 50 years, and she knew my father well,

25  and Menachem Youlus had referred us to a Rabbi Chinn, who was

Cab1you2

an Orthodox rabbi in Pittsburgh to whom I spoke.  Now Rabbi

Chinn subsequently passed away, and I didn't know whether

Menachem Youlus was aware of it, so we wrote a letter telling

him that.  And within the letter we said, my wife and I,

"Rabbi, I cannot even begin to tell you what a blessing you've

bestowed upon us by permitting us to acquire the Torah."  So

you can imagine we were flying this high, only to be crashed to

the ground.

         What is -- and I will be brief, your Honor.  I'm aware

of the court's time.  What is amazing to me is not only the

overall story which was untrue, but how many different variants

of the story there were.  In the first instance, when we became

aware of the fact that there was another Torah, related to a

family by the name of Malinoff, who I believe lived in the

Poconos in Pennsylvania.  The story that they were told was

that a tour stopped in Kamyanets-Podilsky and was told by a

farmer that there were tombstones with Hebrew lettering on

them.  Among the members of the tour, according to what the

Malinoffs have said, was an agent for Menachem Youlus.  He then

told Menachem Youlus what he was told by the farmer and,

according to this article, supposedly Menachem Youlus then went

to Kamyanets-Podilsky and dug up the Torah, and that story

becomes history.

         This -- the story of the Torah took on in essence a

life of its own.  It was -- articles were written clearly

Cab1you2

across the country.  One article appeared in Hadassah Magazine,

which is a Jewish organization, distributed throughout the

country.  An article appeared in The Christian Science Monitor.

And in that article, it says of Menachem Youlus, "Recounting

his experiences with all the calm of reciting a grocery list,

he says, 'I once spent the night in a Soviet prison, I was

beaten up in Germany, and lost two front teeth.  I was once

knocked out.'"  It then went on and said, "Two Torah scrolls

lay nestled among 260 set of bones that belonged to Jewish

children."  Now this is what The Christian Science Monitor says

that Menachem Youlus told them.

In another article which appeared I believe in a blog,

it says, "The remnants of 260 men, women, and children were

still shrouded in clothing that bore the Star of David, which

Jews were forced to wear during the Holocaust.  Discovered four

years ago, the scrolls --" and that's these two "-- were two of

more than 400 Torahs that Youlus and a team of scribes have

unearthed from a dark past.  Youlus has spent the last 19 years

scouring Eastern Europe for them, working with fellow scribes

to restore the scrolls."

Now it's my understanding that Menachem Youlus never

went overseas so that all of these stories are nothing but

fabrication.

As the woman who spoke before me said, I too spoke

with my Rabbi and asked him whether it was appropriate for me

Cab1you2

1   to testify.  This is a Jew testifying against another Jew.  And

2   he said to me, "Bob, Judaism is about justice.  Therefore, you

3   should testify."  And that is what brought me from Pittsburgh,

4   Pennsylvania this morning to this courtroom.  I thought in my

5   father's memory, it was terribly important that I do so, and

6   had he been alive, it is something he would have wanted me to

7   do.

8           And I thank the court for its time.

9           THE COURT:  Thank you, sir.  Mr. Brafman, have you

10  reviewed the presentence report and gone over it with your

11  client?

12          MR. BRAFMAN:  Yes, your Honor.

13          THE COURT:  I will hear you on sentencing.

14          MR. BRAFMAN:  Your Honor, before I begin, there are

15  just two matters that I've told the government that we would

16  mention just for purposes of clarification.

17          The letter dated July 12, 2012 to probation in which

18  we listed certain objections is withdrawn, and the probation

19  officer has noted in his report just certain biographical

20  information that was changed, but to the extent that that has

21  not been changed, these objections are withdrawn.

22          Second, your Honor, I just want the record to reflect

23  and for the court to understand that any argument that I

24  advance either now or how we advanced it in written form, it

25  was our intention to request a nonguidelines sentence pursuant

Cab1you2

1    to a downward variance.  We are not asking for any specific

2    downward departure, and to the extent the sentencing memorandum

3    labeled it as such, that was mistaken.

4            THE COURT:  You know, I figured that that was what you

5    meant.

6            MR. BRAFMAN:  I gave the government a commitment that

7    we would straighten that out.

8            THE COURT:  Okay.

9            MR. BRAFMAN:  Judge, I too spoke with my Rabbi, and I

10   don't know whether that's a good thing or a bad thing.  I have

11   personally dreaded this day for many months, and it's nothing

12   personal.  I've had the privilege of appearing in this court

13   from the first day, but this is, in 37 years, perhaps one of

14   the three or four worst moments I think I've ever had to spend

15   in the well of a courtroom -- for reasons having to do with the

16   case and for reasons having to do with me.

17           I listened to these victims, and there's nothing I can

18   say.  And there's nothing I will say.  And I listened to them

19   talk about the people whose memory is desecrated by what was

20   done, and that includes my grandparents, who were murdered in

21   Auschwitz.  And I did save a Torah, and my father carried it

22   from a burning synagogue on Kristallnacht that is now restored.

23           So when this case came to me, I did not want to be in

24   this case.  I spoke to a very prominent rabbi and said, "I'm

25   not the right guy.  I carry too much baggage."  He said,

Cab1you2

1   "You're the right guy.  That baggage will help you be an even

2   more powerful advocate perhaps in this case than someone who

3   doesn't maybe get it and maybe doesn't understand the pain of

4   everyone in this case."

5        So I stand before you today not as a son or a

6   grandson; I stand before you with great respect as an advocate.

7   But I stand here with great respect for the victims, with great

8   respect for the pain that they have suffered, with great

9   respect for the damage done in the name of Judaism, in the name

10  of charity, and to the memory of those who perished in the

11  Holocaust.  We cannot ignore those facts.  The sort of pain in

12  this courtroom and in this case have weighed on my mind and

13  Mr. Baker's mind for months and months.

14        But it's interesting that with respect to each of the

15  victims who spoke eloquently, what I did not hear, and which I

16  commend them for, I did not hear a cry for vengeance, I did not

17  hear a request for the most severe punishment that the law

18  allows, and I did not hear anything about the word "compassion"

19  or lack of compassion.  And that's what I'm going to talk about

20  today, Judge.  I can't deal with the facts.  The facts are the

21  facts.  I think what we have essentially done is gotten to a

22  point with the government where we have essentially conceded

23  that this is a horrific crime and that once you have a horrific

24  crime, then the question is, how do you go about doing the best

25  you can, given the horrific facts you have, to at least make it

Cab1you2

as right as humanly possible and to hopefully convince a

sentencing court that you are not a worthless human being, that

you have many redeeming qualities, and that's what our

submissions I think have been about and that's what we are

trying to do.  That's what my letter was about.  I speak to the

court very respectfully, I hope, at all times, but very

diligently as an advocate who really, I think, trusts the

system and has grown up in this system and has worked on both

sides of this aisle and understands the role of the US

Attorney's Office.  And these two ladies have conducted

themselves throughout these proceedings with great respect and

great diligence and professionalism, and I have nothing but

praise for both of them.  They have proven to be a credit to

the United States Attorney's Office for the Southern District

of New York.  So this isn't about them and it's not about me.

It's about now, today, and what we do.

          And I want to just say one thing so your Honor doesn't

get me wrong.  I know you've read everything, and I'm not going

to repeat all of the arguments we made, nor am I going to quote

from all of the letters.  But I want to say this, because it's

something I was taught by colleagues.  When you are in the well

of a courtroom, even if you know the judge has read everything

and even if you understand that you may be repeating an

argument you've already made, don't presume that the court has

made up their mind until you are finished and until the last

Cab1you2

word is spoken and do what you were supposed to do as an

ethical advocate.  Be an advocate for your client.  And I do it

for two reasons -- hopefully to convince your Honor that the

power of our argument has merit, or at least some merit; and

second, in fairness to Mr. Youlus, his young children are one

day going to read the transcript of these proceedings that are

available online almost instantaneously today, and they need to

know that there are redeeming qualities to their father, they

need to know that he is not all bad, and they need to know that

despite the bad thing that he did that is indefensible, someone

got up in a public courtroom and said, yes, this is a bad thing

that was done by a fundamentally good man.  And I can't explain

it, and I'm not asking you to forgive him; I'm just asking you

to temper justice with mercy when you decide on the appropriate

punishment.

        So let me just briefly, your Honor, suggest a few

things.  And I will indicate to your Honor, I gave strict

instructions, which obviously were not followed, that I did not

want people in the courtroom, that I don't think it was

necessary, that the degree of embarrassment and humiliation did

not have to be exacerbated.  These people came.  Many of them

are victims.  Many of them have asked to address the court, and

I said no, we're not doing this.  This is not a tennis match of

victims.  You're not -- your claim that you are not considered

a victim by yourself doesn't undo the damage done to the people

Cab1you2

who feel victimized.  It doesn't help.  What does help -- and I
think it's something which I think your Honor may consider --
is that people who were victimized nevertheless write to the
court, some of them very eloquently, and ask for compassion.
They don't forgive him, but they ask for compassion and
leniency on his behalf.

Your Honor, the real question before you today is how
much punishment is adequate and what form that punishment
should take.  So to the extent that the government has claimed
that there is $963,000 that is owed to the victims -- $993,000
that's owed to the victims, we are going to pay that money back
and we are -- most of it is already in an escrow account
awaiting instruction as to how to pay that back.  And we
offered, your Honor, at the time of the plea comment, which I
think was appropriate, quite frankly, that your Honor believed
that forfeiture should go to the victims rather than sit in
some government bank account.  We will obviously follow the
court's direction.  So to the extent that this defendant
unjustly enriched himself, can't do more than give the money
back, and whether he's giving it back because he wants you to
note that fact or because the government forces him to give it
back, the fact is that it's a consideration that the court may
consider.

Your Honor, the letters before your Honor, yes, there
are several hundred, and in the second volume -- we're sorry we

Cab1you2

1    did not index them, but in the second volume, there is an index

2    in the front that does number the letters, and the numbers of

3    the letters, the total is more than 200 letters.  And the

4    letters are interesting, and I know that some letters mean more

5    than others when a sentencing court reads them and maybe some

6    letters, after you've been on the bench for a long time, you

7    just sort of -- "I get it.  He's a good man.  He did a nice

8    thing."  But I want to read to you not from a letter.  I want

9    to cite to you one of the cases -- we cite this our sentencing

10   memorandum, which is the *Serafini* case in the Third Circuit.

11   And what's interesting about the *Serafini* case is, that was a

12   guidelines case.  It was in 2000, before *Booker* and all of the

13   progeny that essentially gives you more discretion, and that

14   was a case where the defendant in *Serafini* did three nice

15   things.  Three.  He did three things, went out of his way to

16   help three citizens, and the *Serafini* court made a big deal

17   about it.  They said when you give money to charity, that's

18   okay, and it's something we would consider, but when you go out

19   of your way to help a fellow citizen, do something that takes

20   your time, takes your effort, that is extra credit.  That is

21   important; maybe more important than simply being a charitable

22   person.

23        You have hundreds of letters in which the kindness of

24   Menachem Youlus to fellow citizens is discussed in detail, and

25   whether it's helping an elderly person or helping a sick child

Cab1you2

or a child with special needs, there is letter after letter
after letter that writes honestly and eloquently about good
things he did.  Not writing a check, not giving ill-gotten
gains to a charity.  I once heard a judge in this building say,
"I'm not impressed with somebody who steals a million dollars
and gives a hundred thousand to a charity.  It doesn't move
me."  But going out of your way to help hundreds of people long
before he ever thought that he would have to stand in the well
of a court and ask for compassion at the time of sentencing,
which is -- again, this is not niceness after you have a
criminal case so that a judge will look kindly upon you.  This
is 25 years of being a good, decent person in which he has
helped people.  How do you reconcile the two people, the nice
man who helps everyone, with the man who -- I can't.  Maybe
there's a higher authority that will one day explain that to
me, but I can't, Judge.  I can't reconcile it.  And Menachem
Youlus recognizes that he has sinned not just by violating the
law, but in the statement that he wrote, which he will read in
a minute, he talks about standing before God and having to at
one point ask forgiveness from God.  I am going to hope I am
not his advocate at that point.  Asking the compassion from a
sentencing judge for this crime is I think different than
asking for forgiveness.  That's a hard ask for forgiveness.
It's hard enough asking for compassion, but forgiveness for
people who were defrauded, I don't know if they're ever going

Cab1you2

to forgive him.  Maybe by asking you to not severely punish

him, that brings out the best in maybe all of us and that even

in this moment when they are so angry, they don't -- they don't

ask you to do something which is solely within your discretion.

          And then I want to read very quickly a quote that I

know your Honor is familiar with, and it's from a judge in this

building that all of us I think have great respect for.  It's a

quote from *United States v. Adelson*, where Judge Rakoff said

something, which again, in that case, it was a pretty serious

crime.  The guidelines were 20 years.  Judge Rakoff imposed a

five-year sentence, I believe, because there were a hundred

people who wrote letters on behalf of the defendant in that

case.  And Judge Rakoff said, in words that I wish I could have

written, to be candid, "Surely, if ever a man is to receive

credit for the good he has done and his immediate misconduct

assessed in the context of his overall life hereto, it should

be at the moment on his sentencing, when his very future hangs

in the balance.  This elementary principle of weighing the good

with the bad, which is basic to all great religions, moral

philosophies, and systems of justice, was plainly part of what

Congress had in mind when it directed courts to consider as a

necessary sentencing factor the history and characteristics of

the defendant."

          Judge, that's what I'm asking you to do under 3553.

You have before you a wide discretion that you didn't have when

Cab1you2

the guidelines were mandatory, and within the discretion that

you have is the right to impose a sentence that is sufficient

but not greater than necessary.  You never had that discretion

when the guidelines were mandatory.  In truth, many judges,

I've heard in the wells of courtrooms throughout the country,

have often said, "I wish I could do a different sentence but

I'm mandated to impose this sentence."

        Your Honor, I am asking for a sentence sufficient but

not greater than necessary.  And now I guess the question is,

what does that mean, and how much is that?  And that's I think

the point that I want to address hopefully last.  The numbers

that are provided by the Sentencing Commission, with all

respect, in many, many areas were somewhat arbitrary, and

subsequent to the *Booker* decision, the courts have allowed a

judge to conclude that those numbers are no longer even

presumptively reasonable and that the court must start with an

analysis but then should look to the defendant and the crime

that the person has been accused of committing and then impose

a sentence which I have said, which is sufficient but not

greater than necessary.  And what the Supreme Court has said

only recently, the punishment should fit the offender and not

merely the crime.  And I'm citing from *Pepper v. United States*,

quoting *Williams v. New York*.  And your Honor, when you try and

craft a sentence that punishes the offender in this case and

not just the crime, I think it allows you to impose a sentence

Cab1you2

1    that does not require a guidelines sentence, because the crime

2    in this case is very serious.  There's no dispute.  But when

3    you look at the other characteristics of 3553, there is no

4    concern that this offender will act in a violent manner or hurt

5    anyone in a violent manner.  There is no concern that he will

6    reoffend.  That I think is uniquely unique to this case, if you

7    will, because this case is just so strange and so different.

8    He will never again be in a position to commit this crime.

9    He's not required to have the removal from society, if you

10   will, that might be appropriate in a case where you are

11   concerned about a defendant being a repeat offender or a repeat

12   danger to the community.

13            So then the question is, what's an appropriate form of

14   punishment, and what factors and considerations must your Honor

15   address or should your Honor consider?  And in every government

16   memo that I've ever seen at sentencing -- and I don't say that

17   in a pejorative way -- when it comes to the family

18   circumstances, there is a short line, and the line basically is

19   that the defendant's family has no one to blame other than the

20   defendant for bringing that horror on them and the defendant

21   should have thought of this before.  But we're beyond that

22   step.  And you know, I know from something you've written that

23   there are -- there are these op-ed pieces that you write and

24   you don't file and you throw them in the trash.  I've been

25   doing it for 30 years, Judge.  I call it dictated but not

Cab1you2

printed.  And you know, we sometimes do that at the spur of the

moment.  But the one I'm writing, which I've been writing for

ten years, is, my adversary is always 30.  As old as I get in

this business, my assistant United States attorney adversaries

are generally people who are substantially younger than I am.

And I don't say that in a bad way, because they're very

talented and capable people, but what they don't get, what I

didn't get, what I don't think anybody gets when you don't have

children, when you don't have a family that's been gone on for

25 or 30 years, as the defendant has -- he's got nine kids, and

he has a wife who is not well, and he has elderly parents who

are not well.  And yes, he should have thought of that at the

time he committed these crimes.  And it's clear from the manner

in which he committed these crimes that he didn't think about

the consequences at the time he committed these crimes or he

wouldn't have committed these crimes, because there's no one to

suggest that he is stupid.  All of the money, all of the money

that was -- that was taken appears to have been squirreled

away.  It's all sitting in some -- there's no trappings of

wealth, your Honor.  There are no cars or fancy homes.  The

probation report values his home at $250,000.  He lives there

with nine kids.  I don't know what motivated him.  I don't know

what created this fantasy life that he lived and to the damage

that he has done.  But the question is now:  What do we do?

And do we warehouse him for 51 months because that sounds like

Cab1you2

1      a good number?  Is that a better number than 18 months or 24

2      months or home confinement and community service that he is so

3      ideally situated for?  I think the number is arbitrary, and I

4      don't think your Honor should go to that number simply because

5      it's been requested or recommended.

6            I think your Honor should and I hope you have taken

7      into account everything I submitted.  I know you have.  I

8      appreciate the patience, because I know I repeated in the well

9      of the courtroom many of the arguments that I have made in

10     writing, and I don't know what else I can say.  And I ask your

11     Honor, if there are specific questions that you want me to

12     address, I will do my best to address them.  But thank you for

13     listening.

14           THE COURT:  Actually, the one question I was going to

15     ask you, you've answered, which is:  Where's the money?  Now I

16     know.  Thank you.

17           MR. BRAFMAN:  It's all in the government's submission.

18     And a million of it is almost in my escrow account that they're

19     going to get the minute you sign the forfeiture order.  And

20     that's what we're talking about.  There are Torahs.  There are

21     many, many Torahs that were bought.  Maybe the invoices were

22     inflated, but they were certified as kosher and independently

23     examined as being real Torahs.  So these people have Torahs.

24     There are kosher Torahs.  Now the fact that the provenance was

25     not what it was and there were fantasy stories, I get it.

Cab1you2

```
1    That's why we're here.  That's the crime.  But it isn't, "I
2    took a million dollars and I went to Vegas or I bought a
3    Mercedes."  That didn't happen in this case, which is very
4    often the case when a crime is motivated by greed, as the
5    government suggests.
6              THE COURT:  Thank you, Mr. Brafman.
7              MR. BRAFMAN:  Thank you.
8              THE COURT:  Ms. Friedlander.
9              MS. FRIEDLANDER:  Your Honor, just briefly, as I said,
10   we don't doubt that Mr. Youlus has committed good works, has
11   done many good deeds in his community.  We don't think those
12   good deeds come close to outweighing all of the 3553(a) factors
13   that show that a guidelines sentence is completely appropriate
14   in this case.  This crime was egregious.  It was sustained.  He
15   relied on his status as a clergy member to commit it.
16             And for all of those reasons and the other reasons we
17   set forth in our memo, this case is entirely appropriate to
18   sentence him to the guidelines range contained in his plea
19   agreement.
20             Thank you.
21             THE COURT:  Mr. Youlus, I've read your letter.  Do you
22   have anything you want to say to me?
23             THE DEFENDANT:  Yes, your Honor.
24             Your Honor, I know that there is nothing that I can
25   say that will excuse my conduct.  I know that I have sinned
```

Cab1you2

 1   before God and also violated the laws of a wonderful country

 2   that has been good to me and my family.  I will carry that

 3   shame and dishonor with me for the rest of my life.

 4        I want to thank my lawyers for guiding me and helping

 5   me to live through this nightmare.  I want to thank my family

 6   for still loving me despite the sadness and shame I have

 7   brought upon them.  I will spend the rest of my life trying to

 8   find the appropriate way to apologize for the agony they now

 9   have to live with.  They are very good people, and I have let

10   them down terribly.

11        I don't know whether I merit compassion, but I have

12   prayed and still pray that you find it in your heart to punish

13   me compassionately and hopefully not separate me from my

14   family.

15        I know that I have a lifetime of atonement ahead of

16   me.  I will spend the rest of my days on this earth trying very

17   hard to do good, even though I know that I will never be able

18   to restore my good name.

19        Thank you, your Honor.

20        THE COURT:  Thank you.  Have a seat.

21        The first thing I feel it necessary to do is to place

22   on the record of this proceeding a summary of why we're here.

23        Mr. Youlus was in the family business -- Jewish

24   Bookstore of Greater Washington, a store that sells Jewish

25   books and Judaica.  And as I understand it, he was a scribe,

Cab1you2

1    one who knew the intricate art, the craft, ancient and

2    honorable, of creating and restoring Torah scrolls.  I can't

3    describe for the record nearly as eloquently as Chaplain

4    Epstein did the importance, the meaning, the sacredness of the

5    Torah, to the Jewish community, to my own Christian community,

6    to the community of Islam, the third great Abrahamic religion.

7    The Books of Moses are foundation to us all.

8         Mr. Youlus founded a charity and solicited donations

9    in support of the stated mission of rescuing Torahs, locating

10   and acquiring Torahs that had survived the Holocaust or been

11   taken from persecuted Jewish communities, and to inspect,

12   repair, and restore these Torahs so that they could be used in

13   worship.  A noble goal, a goal that was calculated, calculated

14   to play on the emotions of a people for whom the persecutions

15   of the early and middle part of the last century were a living

16   memory, many of whom were personally witnesses or who, through

17   their family, or what remained of their families, were

18   witnesses to the horrors of what happened in Nazi Germany, in

19   Eastern Europe, in Soviet Russia, and elsewhere in the world.

20        But we're not here because Mr. Youlus was not really

21   about the business of rescuing Torahs that had been lost to

22   persecution.  That, in the end, is a religious matter.  We are

23   here because Mr. Youlus is a liar and because he lied in order

24   to obtain money and because he utilized the beneficence of his

25   fellow citizens in the form of the tax code of the United

Cab1you2

1   States to structure his little enterprise so that he could

2   obtain money under false pretenses, for his own purposes.  I

3   don't know what his purposes were.  They weren't the usual

4   purposes.  Mr. Brafman is correct.  There's no condo in Miami,

5   there's no Mercedes, there are no exotic vacations.  It's not

6   another purpose that I have confronted frequently in cases of

7   this ilk, which is taking money from this person so that it can

8   be used by the charitable light of the thief.

9        Fortunately Mr. Brafman did not stand up, because he

10   didn't have to stand up, he couldn't stand up and say that

11   Mr. Youlus had used the money he obtained under false pretenses

12   to give it to the poor or to build a synagogue in his own

13   community or to do anything like that, because if he said that,

14   then I would have said, well, you wouldn't say in those

15   circumstances, would you, that nobody has the right to take

16   other people's money and use it for what is charitable by their

17   own light.  But that's not the case.  As near as I can tell,

18   the reason is that Mr. Youlus has a screw loose, that

19   Mr. Youlus has this desire to be something he's not, which is

20   an adventurer, a hero.  In the end that does not matter because

21   the reason for stealing does not matter.  A misrepresenter's

22   reason for lying does not matter.  It does not matter.  What

23   matters is the lie and the obtaining of money under false

24   pretenses, pretenses to religious people, and we have heard

25   eloquently today, I have read, eloquently expressed, dozens

Cab1you2

1   upon dozens of letters from people whose religious

2   sensibilities were not just offended but trampled on by the

3   misrepresentations that were made.  The misrepresentations were

4   to the entire American people, because Mr. Youlus and Save the

5   Torah claimed that Mr. Youlus wasn't earning any profit or

6   compensation from his work with the charity, which allowed Save

7   the Torah to obtain federal tax exempt status to which it was

8   not entitled, because it did not comply with the statute's

9   requirement that no founders or members of the board of

10   directors of the charity receive any profit from their position

11   with the group.

12          I believe the government estimated Mr. Youlus ended up

13   with about $1.2 million.  The fact that it's sitting in a bank

14   account and available to repay the people who would not have

15   given it to him if only they had known the truth doesn't mean

16   he didn't get it, or that he didn't get it by false pretenses.

17          It's a strange story.  It's a sad story.  It's an

18   incomprehensible story.

19          Now I'm sitting here, having listened to various

20   people.  Mr. Brafman says that he's heartened no one who

21   spoke -- and certainly there's not much in the letters -- asked

22   for vengeance or sought retribution.  But that is not the rule

23   of law, to exact vengeance.

24          Mr. Brafman also very eloquently said that forgiveness

25   would be a hard ask.  That is undoubtedly true, but as I have

Cab1you2

told defendants over and over and over again, I'm not about

forgiveness.  That is between Mr. Youlus and his maker.  That

is between Mr. Youlus and the people he has hurt.  The law is

about doing justice; doing justice to the perpetrator and

giving justice to the victims.  The law in its own way is what

Chaplain Epstein's rabbi told her her statement would be about.

The law is about bearing witness, bearing witness to what we as

a society have agreed collectively are the rules of the game in

which we are all commonly engaged.  Justice and witness are

satisfied by meting out a sentence that is sufficient but not

greater than necessary to carry out the goals of the sentencing

statute that has been crafted by the Congress of the United

States.

                (Continued on next page)

1        THE COURT:  In deciding what is sufficient, but not

2   greater than necessary, I am to consider a group of people who

3   make it their business to think about these things, who have

4   gotten together and have come up with a guideline for what,

5   roughly, somebody who commits a crime like this one and who's

6   like Mr. Youlus, sort of, was to get by way of punishment.

7   That guideline would be 51 to 63 months in a federal

8   penitentiary.  Thankfully, I am no longer shackled by that.  It

9   is no longer a mandate, but it is something that I am required

10   to take into account.

11        Then I have to take into account the nature and

12   circumstances of the crime.  And I can't quarrel with

13   Ms. Friedlander's characterization of the nature and

14   circumstances of the crime.  For a member of the clergy to prey

15   on the religious sensibilities of his co-religions is, frankly,

16   a crime that turns my stomach in a way that few others do.  You

17   are not the first rabbi, you are not the first man of the cloth

18   who has sat in front of me in these circumstances, and it

19   doesn't get any easier for me to think about these stories

20   because I've heard them before.

21        For those of you who express embarrassment because it

22   was one of your own community, one of your own members of the

23   clergy who had done this, and who wonder how you would explain

24   this to those of other faiths, please, you are not alone and we

25   all understand and appreciate and share your grief that this

CABBYOU3                          Sentencing

1    thing could have happened.

2           I have received letters from religious congregations,

3    from youth organizations, charitable organizations, kids, young

4    people donating their bar mitzvah money to this organization,

5    from groups of Holocaust survivors and their descendants, from

6    people who are comfortable, from people who are struggling

7    financially but for whom making this particular gesture was of

8    critical psychological and emotional importance.

9           And, Mr. Youlus manipulated those people and he preyed

10   on those people.  And whatever the reason for it, there is no

11   excuse.  It was brazen, it was horrible, and took a while for

12   it to be exposed.  I certainly have read Mr. Rosensaft's

13   letter.  Mr. Rosensaft appears to be the Harry Markopolos of

14   the story.  He's the guy who got it first.

15          So the government's characterization of the nature and

16   circumstances of the offense is not something that would cause

17   me to vary from the guidelines.  It might even cause me to go

18   above the guidelines.  Certainly does not move me to vary from

19   the guidelines.

20          The history and characteristics of the defendant,

21   something else I must take into account.  Mr. Youlus is

22   described by all of these people in these two books, whose

23   letters I have read, as being a person who does good things for

24   others.  He helps with marriages, he prepares scrolls, he makes

25   kosher things that need to be kosherized.  He's there with

1     advice.

2          The reason I was hoping someone would tell me what

3     happened to the money is usually these letters are all about

4     how he helps people, he gives me money.  There's none of that

5     in there.  Okay.  So to the people he knows, he's a nice guy.

6     To the people he doesn't know, he didn't care.  I believe that

7     in the Torah every Jew, and therefore every Christian, every

8     Muslim, is required to do good to the widow, to the orphan and

9     the alien in your midst.  And I understand that to mean you

10    ought to be to strangers as you are to the people that you

11    encounter in your own community.

12         People who have written to me, in the other pile of

13    letters, people of whom Ms. Friedlander speaks, people who

14    spoke here today, they're strangers to you and you did not care

15    for them.  And the fact that you are a rabbi, trained and

16    immersed in your religious tradition, it just makes it that

17    much worse.  Because I must believe that one who is trained in

18    a religious tradition that like none other is founded on the

19    law knows that it is never right to take under false pretenses,

20    to pretend to be someone that you're not.

21         So neither the nature nor the circumstances of the

22    crime or the history and characteristics of the defendant

23    suggest that I should be particularly lenient here.  I must

24    say, I feel the same way about the fact that you're going to

25    pay back the money that is sitting there waiting to be given

1   back to the people to whom it rightfully belongs.  Whether

2   you're doing it because-- I hope you're not doing it to impress

3   me because it doesn't impress me.  It's just something you have

4   to do.  It's not extraordinary.  You pay them back twice over,

5   three times over, ten times over, maybe that's extraordinary.

6   To give them back what they gave to you, that's not so

7   extraordinary.

8          So then we come to the next section of the sentencing

9   law.  I'm supposed to think about what kind of a sentence would

10  punish you because, in the end, as I once said in print, you

11  know, I'm about retribute of justice.  That's what I'm supposed

12  to do.  I'm supposed to decide what the punishment is.  And I'm

13  supposed to think about what will send a message to other

14  people who might be tempted to do the kind of thing that you

15  did.  I have to think about proportionality, although, frankly,

16  it's very hard for me to acquaint this to anything that I've

17  ever encountered.

18         And I must tell you, I think you must go to jail, and

19  I think the guidelines get it about right.  And I happen to

20  think that is a compassionate sentence, because if there were

21  no guideline suggested to me, I might well be tempted to give

22  you a whole lot more time.  Will your family suffer?  Of course

23  your family will suffer, and that is a terrible tragedy.  You

24  have brought it on them yourself.

25         I hope and expect -- indeed, I will require -- that

CABBYOU3                          Sentencing

1   when you leave prison, you will live a righteous and honorable

2   life.  If you don't, I will have to put you back in.  But that

3   prospect does not move me to excuse you prison because that

4   would not be justice.

5            Finally, to those of you who have spoken so eloquently

6   and so movingly, I know the importance of Torah to your

7   communities and I grieve for the pain that you feel because

8   your gesture of honor on behalf of loved ones has been -- or so

9   it may seem -- thrown back in your face.

10            I love those five books.  They're probably, just in

11   terms of literary merit, among the five best books ever

12   written; certainly among the most interesting.  And I have to

13   believe that what they contain can somehow be divorced from

14   what has happened here and that the words on the scrolls that

15   do exist can be given life through your families, through your

16   congregations.

17            And that, ultimately, their meaning and the fact that

18   they still retain that meaning in spite of all this can be

19   found in the words of the prophet Jeremiah in a book that is

20   not Torah, but is Tanak.  He said, "I will write the law in

21   their hearts."  You could not speak the way you spoke today if

22   the law were not written in your hearts.  This man cannot take

23   that away from you or from your loved ones or from your

24   memories or from your history.  Hold to that.

25            I have reviewed the presentence report.  I accept it

CABBYOU3                    Sentencing

1    and adopt as my findings the description of the offense and the

2    offense conduct, its calculation in the guidelines.  The total

3    offense level, based primarily on the amount of the financial

4    loss, is 24.  The criminal history category of the defendant is

5    I.  And I should note, it is Criminal History Category I

6    because the defendant has never before been convicted of a

7    crime, but that does not make this conduct aberrational.  This

8    is conduct that went on over a period of about seven years, day

9    in and day out, and that's not aberrational.

10             I accept and adopt as my findings the offender

11   characteristics that are set out beginning at paragraph 83 of

12   the presentence report.  I believe, Mr. Brafman, that the

13   probation officer made the changes that were not otherwise

14   withdrawn in the most recent version of the presentence report

15   that I got on September 27.

16             MR. BRAFMAN:  That's correct, your Honor.

17             THE COURT:  Okay.  So I don't have to make any

18   corrections to this document.

19             MR. BRAFMAN:  That's correct.

20             THE COURT:  Sir, will you please stand.  Under Docket

21   No. 12 Criminal 36-01, a total offense level of 24, Criminal

22   History Category of I, I hereby sentence you, Menachem Youlus,

23   to be remanded to the custody of the Attorney General of the

24   United States and the Bureau of Prisons for a term of 51 months

25   to be followed by a term of three years' supervised release.

CABBYOU3                    Sentencing

1    The terms of imprisonment and supervised release are concurrent

2    on both counts.

3            The other financial penalties are such that I am not

4    imposing a fine other than there is a special assessment of

5    $200 in the nature of court costs which is due and payable

6    immediately.

7            Before we get into the financial stuff, Mr. Brafman,

8    are there recommendations that you would like me to make

9    concerning this?

10           MR. BRAFMAN:  Yes, your Honor.  First, with consent of

11   the government and subject to your Honor's approval, we would

12   ask that the defendant be permitted to voluntarily surrender.

13   I've spoken to a representative of the Bureau of Prisons

14   concerning the amount of time needed for designation.  We ask

15   for a surrender date of December 17th.  Because of the

16   intervening holidays, it takes a little bit longer.  If there

17   is a designation to the recommended facility or elsewhere prior

18   to that date, we can always advance the surrender date.

19           THE COURT:  December 17th is fine with me.

20           MR. BRAFMAN:  Thank you, your Honor.  And we would ask

21   for a recommendation for religious and dietary reasons that the

22   defendant be permitted to serve his sentence in the Otisville

23   federal prison camp in Otisville, New York.

24           THE COURT:  Otisville is--

25           MR. BRAFMAN:  I know it's a recommendation.

1        THE COURT:  Otisville appears to be, as far as I know,

2   about the only place in the northeastern United States that may

3   be able to accommodate the defendant.  By the same token,

4   Otisville is very full.

5        MR. BRAFMAN:  I know, but we --

6        THE COURT:  I will certainly make the recommendation,

7   but no guarantees.

8        MR. BRAFMAN:  I understand it's only a recommendation,

9   your Honor.  Thank you.

10        THE COURT:  But I'm making it Otisville.  I'm not

11   making it the camp.  I'm saying Otisville.  All right?

12        MR. BRAFMAN:  Your Honor, to the extent that the

13   defendant is deemed camp eligible, I'm not hearing that your

14   Honor objects to that.

15        THE COURT:  No, but that's for the BOP.

16        MR. BRAFMAN:  I understand, your Honor.

17        THE COURT:  All I'm saying is that I know that

18   Otisville has the ability to accommodate the religious

19   restrictions.

20        Okay.  Now, sir, we have mandatory restitution in this

21   case, and I have been given an order by the government under

22   these new procedures that seem to be followed this days.  The

23   order indicates that restitution will be paid in the amount of

24   $990,366.05, and that amount is ordered paid as restitution

25   under the Mandatory Victims Restitution Act to the victims of

CABBYOU3                          Sentencing

1    the offenses charged in Counts One and Two, those victims being

2    listed on Schedule A.

3              Yes, Ms. Friedlander, you quickly want to jump up?

4              MS. FRIEDLANDER:  Yes, actually, I do.  We are going

5    to submit a slightly revised Schedule A to the Court in the

6    morning.  The Schedule that we have submitted has a couple of

7    just typographical errors.  It does not change the amount of

8    restitution owed or any material.

9              THE COURT:  Mr. Brafman, is it all right with you--

10             MR. BRAFMAN:  No objection.

11             THE COURT:  -- if you look it over tomorrow and make

12   sure that it's all right?

13             MR. BRAFMAN:  Yes, your Honor.

14             THE COURT:  On this 11th day-- it is the 11th, isn't

15   it?

16             MR. BRAFMAN:  11th.

17             THE COURT:  Thank you.

18             -- day of October, 2012, restitution is ordered in

19   that amount.  And consistent with the Mandatory Victims

20   Restitution Act and Federal Rules of Criminal Procedure 49.1,

21   the schedule of victims is going to be filed under seal except

22   that copies may be retained, used or disclosed by the

23   government, the clerk's office, and the probation office in

24   order to effect the purposes of this order.

25             There is, in addition here, a consent order of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CABBYOU3                        Sentencing

1   forfeiture.  I said at the time of the plea that I did not

2   understand, and I still do not understand, the idea of having

3   both restitution and forfeiture when it's the same money.  As

4   far as I'm concerned, restitution comes first.

5        MR. BRAFMAN:  Well, then, as I understand it then, the

6   amount that will be forfeited will be credited against the

7   restitution?  That's the understanding we have with the

8   government, I believe.

9        THE COURT:  If that's the understanding that you have

10  with the government, that's fine.  If I ever hear that that

11  money is sitting in a federal bank account somewhere and has

12  not been distributed to the victims, I will be mightily upset.

13       MS. FRIEDLANDER:  Yes.  Your Honor, we had spoken with

14  the chief about the forfeiture of our office and we are going

15  to apply under the department--

16       THE COURT:  I was hoping you would have applied before

17  today and gotten permission so I would be secure in the

18  knowledge that the victims would have gotten their money back.

19  That's all I care about.

20       MS. FRIEDLANDER:  Yes, we understand.  Your Honor, we

21  are permitted to apply by the Department of Justice upon the

22  entry of the forfeiture order, so we will apply immediately.

23       THE COURT:  Oh, yes, the Department of Justice.

24  Always looking out for itself.  Okay.

25       Well, it is hereby ordered that as a result of the

offenses charged in Counts One and Two of the information to

which you have pled guilty, a money judgment in the amount of

$862,044.33 in United States currency shall be entered against

you pursuant to Rule 32.2(b)(4) of the Federal Rules of

Criminal Procedure.  This consent order of forfeiture is final.

as to the defendant, Menachem Youlus, as I read this order, it

is deemed part of your sentence, Mr. Youlus, and will be

included in your judgment of conviction.

Upon execution of this order of forfeiture and

pursuant to 21, United States Code, Section 853, the United

States Treasury Department shall be authorized to deposit the

payments on the money judgment in the Treasury Asset Forfeiture

Fund and the United States shall have clear title to such

forfeited property even though it really belongs to the

victims.

Pursuant to Rule 32.2(b)(3) of the Federal Rules of

Criminal Procedure, upon the entry of this order, the United

States Attorney's Office is authorized to conduct any discovery

that's needed to identify, locate or dispose of forfeitable

property, including taking depositions, propounding

interrogatories, requesting the production of documents, and

issuing subpoenas pursuant to Rule 45 of the Federal Rules of

Criminal Procedure.

All payments on the outstanding money judgment shall

be made by postal money order, bank or certified check made

CABBYOU3                        Sentencing

1    payable in this instance to the United States Treasury

2    Department and delivered by mail to the United States

3    Attorney's Office, Southern District of New York, Attention:

4    Asset Forfeiture Unit, One St. Andrew's Plaza, New York, New

5    York, 10007, indicating Mr. Youlus's name and the case number.

6            This Court shall retain jurisdiction to enforce this

7    order and to amend it as necessary pursuant to rule 32.2(e) of

8    the Federal Rules of Criminal Procedure.  I have signed the

9    order today, the 11th of October, at 5:53 p.m.  And it is my

10   expectation that that money will be given to the victims.

11           Now, Mr. Youlus, when you get out of prison, you will

12   be on supervised release.  Within 72 hours of your release, you

13   will report to a United States probation officer in this

14   district either here in Manhattan -- by that time I hope the

15   probation office will be back in this building -- or in White

16   Plains or in Middletown.  You will be assigned a probation

17   officer and you will report to that probation officer on a

18   regular basis for three years.  You will do everything the

19   probation officer tells you to do.  You may do nothing that the

20   probation officer tells you not to do.  You may not commit

21   another federal, state or local crime.  You may not illegally

22   possess any controlled substance.  You may not possess any

23   firearm or destructive device.  The mandatory drug testing

24   condition is suspended.  The defendant poses a low risk of

25   future substance abuse.

1      You must cooperate in the collection of genetic

2  material, DNA, for inclusion in the criminal database.  You

3  must obtain and maintain legitimate and verifiable employment,

4  which employment as a special condition cannot involve other

5  people's money.  You cannot for that three-year period do any

6  kind of work that makes you responsible for other people's

7  money.

8      You may not associate with criminals.  You may not be

9  found in places where criminal activity is being planned or

10  carried out.  Your probation officer must at all times know

11  what your residence and work addresses are.  You may not change

12  those addresses without giving ten days' advanced notice to the

13  probation department.  And if there's an emergency, if there's

14  a gas leak in the house and you have to leave, within 48 hours

15  your probation officer must know where you can be found.

16      As special conditions of supervision, you must provide

17  your probation officer with access to any requested financial

18  information, and you shall not incur any new credit charges or

19  open any additional lines of credit without approval of your

20  probation officer unless you have paid the restitution.  It has

21  been represented to me that the entirety of the restitution is

22  going to be paid forthwith.  It is, therefore, not necessary to

23  set a payment schedule.  The payment schedule is pay it within

24  the next 60 days.

25      MR. BRAFMAN:  Can I get some guidance from your Honor

CABBYOU3                          Sentencing

1    in a moment, Judge?

2              THE COURT:  Any time you want, Mr. Brafman.

3              MR. BRAFMAN:  Thank you.  Judge, we have an

4    understanding with the government -- and I know the mechanics

5    are a little bit tortured and it's nothing that you can

6    control.  It was our understanding -- obviously based in part

7    on your Honor's comments at the time of this plea -- that the

8    Court wants the money to go to the victims and that there isn't

9    two piles of money available, so that this pile is going to

10   hopefully be transferred by asset forfeiture to the

11   government.

12             We will have all of the money within the 60 days that

13   your Honor-- we have most of it now.  My concern is that once

14   I --

15             THE COURT:  Here's what you should do, Mr. Brafman.

16   I'll give you guidance as to what you should do.  You give the

17   government its $862,000.  You write a check to the United

18   States Marshal and you give the government that money and you

19   give the rest of the money to the clerk of the Court.  And

20   then, as far as I'm concerned, it's quits and you have no

21   further obligation to give financial information to the

22   probation officer.

23             MR. BRAFMAN:  That's fair.

24             THE COURT:  That is my understanding.  Okay?

25             MR. BRAFMAN:  And my hope is that eventually that the

1  balance of the money will go to the victims.

2           THE COURT:  It better.

3           MR. BRAFMAN:  Okay.  I will do what your Honor

4  suggests.

5           THE COURT:  Thank you.

6           As a special condition of supervision, Mr. Youlus, you

7  shall perform 100 hours of community service as directed by

8  your probation officer.  And it is my recommendation to the

9  probation officer that the community service be directed to

10 persons outside of the defendant's community, because one of

11 the things that makes this crime a terrible crime is that the

12 defendant, who was very good to the people he knows, was very

13 not good to people he didn't know.  So he should do good works

14 for people he doesn't know.

15          As I said, you're to report to the nearest probation

16 office within 72 hours of your release from custody.  It is my

17 recommendation that you be supervised by your district of

18 residence.

19          And I don't anticipate that there will be any

20 restitution still owing by the time you get into prison.  If

21 there still is restitution owing, then, if you're engaged in

22 the Bureau of Prisons' non-UNICOR work program, you'll pay $25

23 per calendar quarter toward your criminal financial penalties,

24 or 50 percent of your gross monthly earnings if you're a UNICOR

25 Grade I through IV employee.  But that only applies -- I don't

CABBYOU3                    Sentencing

1    want to make Mr. O'Neill's life miserable because he has to

2    write this -- but that only applies if the restitution hasn't

3    been paid by the time you report to prison.

4          I'm allowing you to surrender voluntarily on the 17th

5    of December.  Mr. Brafman will be notified about your

6    designation to an institution.  You have to report to that

7    institution before 2 p.m.  If you're not there by 2 p.m., we'll

8    get a phone call at about 2:01; by 2:02 I will sign the warrant

9    for your arrest.  So forewarned is forearmed.

10         The other thing that I have to say to you is I'm

11   really not expecting to see you again, Mr. Youlus, but if you

12   should transgress any of the terms and conditions of your

13   supervision -- the probation officers in this district

14   understand how I feel about it.  I'm a zero tolerance Judge.

15   So if you should transgress, they'll bring you in front of me.

16   If I see you during that three-year period, I'll be extremely

17   upset.  And when I get upset, I have a tendency to do things

18   that defendants don't particularly like, like put them back in

19   jail.

20         I just think it's only fair to warn you that that's my

21   predilection.  I would, of course, listen to Mr. Brafman's

22   explanation for why you were there, but I start with a bias.

23   The bias is that during that three-year period, you can do

24   nothing wrong.  Forewarned is forearmed.  All right?

25         Mr. Brafman, is there anything else that we need to do

CABBYOU3                     Sentencing

1   from your perspective today?

2            MR. BRAFMAN:  No, your Honor.

3            THE COURT:  I thank you, Mr. Brafman.  I actually --

4            MR. BRAFMAN:  Your Honor, I'm sorry.

5            THE COURT:  I can actually imagine how painful this

6   has been.

7            MR. BRAFMAN:  Your Honor.

8            THE COURT:  Yes.

9            MR. BRAFMAN:  I'm sorry, I stepped on your Honor's

10  words, but I thank you for what you were saying.

11           Your Honor, the government has asked me to place on

12  the record in spot of this plea agreement, Mr. Youlus has

13  waived his right to appeal to the extent there was a sentence

14  of 51 months or within the guidelines.

15           THE COURT:  I think 63 months or less.  Is that

16  correct?

17           MR. BRAFMAN:  Correct.

18           THE COURT:  I knew I forgot something.  Thank you.

19           Ms. Friedlander.  She's ready.  She's ready to get up.

20  Okay.

21           Do you recall, Mr. Youlus, that at the time you took

22  your plea, you and I had a conversation about your appellate

23  rights?

24           THE DEFENDANT:  I remember that.

25           THE COURT:  And do you recall that I told you that you

CABBYOU3                    Sentencing

had signed a letter with the government which provided that, if

I sentenced you to 63 months or less, you would not take an

appeal from your sentence?  Do you remember that?

THE DEFENDANT:  Yes.

THE COURT:  And do you recall that I asked you at that

time, were you signing the letter of your own free will?

THE DEFENDANT:  Yes.

THE COURT:  And you told me that you were.  Do you

recall that?

THE DEFENDANT:  Yes.

THE COURT:  Do you adhere to that statement today?

THE DEFENDANT:  I do, yes.

THE COURT:  In that case, it's my understanding that

you have waived your right to take an appeal from your

sentence.

Is that also your understanding?

MR. BRAFMAN:  Yes, your Honor.

THE COURT:  Thank you very much.

Ms. Friedlander, is there anything else we need to

talk about?

MS. FRIEDLANDER:  No.  Thank you, Judge.

THE COURT:  One of the victims, Mr. Epstein, mentioned

Ms. Clancy, but Ms. Clancy doesn't get a whole lot of public

credit for the work that she does, but she makes it very easy

on us judges.  And I want to thank you for having organized

CABBYOU3                    Sentencing

1    this so well.  Thank you very much.

2               Okay.  These proceedings are closed.

3               (Adjourned)